ALBRIGHT *v.* MUNCRIEF.

4-7248                                    176 S. W. 2d 426

Opinion delivered November 15, 1943.

*John P. Vesey* and *Murphy & Wood,* for appellant.

*Owens, Ehrman & McHaney,* for appellee.

HOLT, J. Appellee, on August 12, 1943, by appropriate action, sought to recover two teletype machines. He alleged, in his complaint, that appellants, members of the Arkansas State Police, without proper search and seizure warrant, entered his place of business in the city of Hot Springs and unlawfully seized the machines in question, in violation of his constitutional rights "as set forth in Amendment No. 4 and Amendment No. 14 of the Constitution of the United States and in art. 2, § 15 of the Constitution of the State of Arkansas." He further alleged that the machines were not subject to seizure. Appellants, in their answer, denied that they were without power to seize the machines in question and further alleged that at the time of seizure, the machines were being used as gambling devices and therefore were subject to seizure and confiscation. There was a trial before the court upon an agreed statement of facts and a finding and judgment for appellee on all issues. This appeal followed.

The facts as stipulated by counsel are: "The plaintiff is a resident of Hot Springs, Arkansas, and owns and operates a printing business at 316 Ouachita Avenue, in the city of Hot Springs, Arkansas; that in said printing establishment there were located two ticker tape machines. These ticker tape machines were connected by direct wires with the Western Union Telegraph system; that plaintiff received over said ticker tape machines information concerning the running of horse races at the several different race tracks operating in the United

States; that prior to the running of said races the plaintiff received over said ticker tape machines information concerning said races—that is, the names of the horses, the names of the jockeys, the weight carried by the horses, the condition of the tracks, and the odds on each horse; that the plaintiff, by direct wire, relayed said information to various places in the city of Hot Springs, more commonly known as 'bookies,' which places were conducted and operated as public betting places where bets were received by the operators at said places on the horse races concerning which the information supplied by said ticker machines was given; that after the running of said races the plaintiff would receive over the said ticker tapes the results of said races, and would immediately furnish that information by direct wire to the above mentioned places; that plaintiff knew that the said 'bookies' were using this information in the operation of their business.

"The said two ticker machines were primarily used for obtaining information to be furnished to said places above mentioned. However, the plaintiff did also furnish the same information to a daily newspaper published in Hot Springs, Arkansas, and also used said information in his printing business for the purpose of printing circulars and handbills concerning races. Plaintiff was paid for furnishing this information.

"At the time said ticker machines were seized information was being received relating to horse races at the different tracks in the United States concerning the entries in said races, track odds, the names of the winning horses, and the horses that placed and showed; that at the time said machines were seized there were two operators relaying the information to the various places above mentioned by direct telephone wire, beginning with the information as to the condition of the track, the horses in each race, the names of jockeys, etc., with a continuous line of information until the races had been completed showing which horses were leading at the quarter, the half, at the stretch and at the end of each race. The information so relayed by these two operators

was received in the places above mentioned and posted on a blackboard so that customers could see the entries, odds, etc., and in some of the places a loud speaker was used to announce to the customers all of the information so received from the ticker machines.

"The two machines involved in this action were seized by the defendants, their agents, or deputies, on the 7th day of August, 1943, the said officers seizing them purporting to act under and by virtue of the authority of a search and seizure warrant, a copy of which is attached hereto and made a part hereof. The warrant attached hereto constitutes the complete record of proceedings had in connection with the issuance of said warrant. No affidavit of probable cause was filed with or exhibited to the justice of the peace issuing said warrant. No copy of said warrant was left with the plaintiff. No receipt for the property taken was given to him. The property seized was removed by the defendants from Garland county and was taken to the State Police headquarters in Pulaski county, Arkansas, and is at the present time held at said place. At the time suit was filed, no return had been made on said warrant by the officers seizing the property. Hot Springs, Arkansas, has a municipal court created by Act No. 2 of the Acts of 1917.

"The plaintiff was not arrested, and up until the present time has not been arrested or charged with the violation of any law whatsoever.

"The machines which were seized are ordinary telegraph instruments designed for the purpose of receiving telegraphic information by wire and transcribing same. The machines seized in this case are no different from any other telegraph ticker machine, and the machines may be exhibited to the court as evidence.

"No gambling of any kind was carried on in the premises occupied by plaintiff and in which the machines seized were located. The plaintiff does not own or operate any gambling establishments whatsoever, and has no connection with any gambling establishments, except as hereinbefore stated. The consideration paid to plaintiff by his customers is in payment for information fur-

nished and the amount thereof is a certain fixed amount and does not depend upon the success or failure of any business conducted by his customers.

"In the operation of his business the plaintiff invited the public generally to come and patronize his printing business. At the time the machines were seized his printing business was in operation, the door from Ouachita Avenue to plaintiff's place of business was open, his business was being operated; and the officers walked in the front door and to the machines without the use of physical force. The machines in question were not visible from the street or to the public in general, and were in a room separate and apart from that occupied by his printing establishment."

The first question presented is: Were the teletype machines, on the facts, gambling devices and subject to seizure and forfeiture?

It must be conceded that the teletype machines were not gambling devices, *per se*. It does not follow, however, that they would not become gambling devices, under our statutes, when used for gambling purposes.

Section 3320, Pope's Digest, of our criminal law on gaming provides: "Every person who shall set up, keep or exhibit any gaming table or gambling device, commonly called A. B. C., E. O., roulette, rouge et noir, or any faro bank, or any other gaming table or gambling device, or bank of the like or similar kind, or of any other description although not herein named, be the name or denomination what it may, adapted, devised, or designed for the purpose of playing any game of chance or at which any money or property may be won or lost, shall be deemed guilty of a misdemeanor, etc."

Section 3322, Pope's Digest, provides: "Every person who . . . shall be interested, directly or indirectly, in running any gambling house, or in setting up and exhibiting any gambling device or devices, either by furnishing money or other articles for the purpose of carrying on any gambling house, shall be deemed guilty of a felony, and on conviction thereof, shall be confined

in the state penitentiary for not less than one year nor more than three years.''

Section 3327 makes it the duty of the justices of the peace, on information given or on their own knowledge, or where they have reasonable ground to suspect, to issue their warrant to some peace officer, directing in such warrant a search for such gaming tables or devices hereinbefore mentioned or referred to, and directing that, on finding any such, they shall be publicly burned by the officer executing the warrant.

And § 3335 provides: ''The judges of the several courts in this state shall, in their construction of the statutes prohibiting gaming, construe the same liberally, with a view of preventing persons from evading the penalty of the law, by changings of the name, or the invention of new names or devices, that now are or may hereafter be brought into practice in any and all kinds of gaming, and all general terms of description shall be so construed as to have effect and include all such games and devices as are not specially named, and in all cases, when construction is necessary it shall be in favor of the prohibition and against the offender.''

This court in *Fox* v. *Harrison,* 178 Ark. 1189, 13 S. W. 2d 808, held in effect that a place operated for the purpose of permitting betting on horse races is a gambling house, although the issue in that case was dog racing. See, also, *Albright et al.* v. *Karston, ante,* p. ..........., 176 S. W. 2d 421, this day decided. Section 3322, *supra,* makes every person interested directly or indirectly by furnishing ''any articles'' for the operation of a gambling house, guilty of a felony, and under §§ 2934-5, Pope's Digest, anyone who aids, assists or abets another in the commission of a crime, becomes an accessory, or principal offender, and subject to punishment as such.

Here, the facts disclose that appellee operated, in his place of business in the city of Hot Springs, two teletype machines. Through these machines, there was transmitted, by telegraph, from a large number of race tracks throughout the United States, information on horse races being run on the various tracks. The information re-

ceived by appellee, over these machines, contained the announcement of the names and numbers of the horses entered, the jockeys and their weights, the odds on each horse, the starting of the races, the progress of the horses around the track and the winners. This information came to appellee over the machines in question by means of a ticker tape mechanism, on which was spelled out the report of the race so that appellee's operators, who sat one at each machine, read these reports, as received on the tape, into the mouthpiece of a telephone, which was connected by direct wire from appellee's place of business to the various gambling houses in Hot Springs, thereby giving to each house instantaneous reports as received. In each gambling house, these reports so received from appellee, were announced by the operator at the receiving end of the telephone, in most cases, over a loud speaker to the assembled customers of the gambling house, and placed upon a large blackboard for all to observe. These teletype machines were used by appellee primarily to furnish this information upon which bets were made, to the various gambling houses, or "bookie" establishments, as they are sometimes called. Appellee. was paid for this service and he knew the use made by the gambling houses of the information which he was furnishing them from the teletype machines.

We think it clear, on the admitted facts, that appellee had deliberately converted these teletype machines to an unlawful use and purpose, thereby converting them into gambling devices "adapted, devised or designed" for the purpose of playing a game of chance, that is, betting on horse races, at which money or property might be won or lost, and, therefore, all property rights in these machines were forfeited and they were subject to seizure by appellants. The use to which these machines were knowingly put by appellee, for pay, was the principal factor in the present, most modern operation of the various gambling houses to which he furnished the service. While appellee was not physically present with the machines in question, in each of the gambling houses, we think he was constructively present with these machines, aiding and abetting the operation of these gambling

houses through the use of the machines and was equally guilty, along with the operators of the houses, of a felony.

. "The question who is generally liable for . . . maintaining gambling houses . . . obviously depends upon the wording of the particular statute involved. (24 Amer. Jurisprudence, 428, § 44.)

In *State* v. *Sanders,* 86 Ark. 353, 111 S. W. 454, 19 L. R. A., N. S. 913, this court said: "A gambling device is an instrumentality for the playing of a game upon which money may be lost or won; and the instrumentality is not necessarily intended solely for gambling purposes. 14 Am. & Eng. Enc. Law, 684-5; 20 Cyc. 882-4. Certain gambling devices cannot be used for any other purpose, and, when designed for that purpose alone, they may be destroyed under the 'burning statutes.' *Garland Nov. Co.* v. *State,* 71 Ark. 138, 71 S. W. 257. But there may be gambling devices that are no less such, although not always so used, but which, from their nature, may be used for other purposes. *State* v. *Lewis,* 12 Wis. 434. Under a . kindred statute, the Alabama court said: 'The statute is aimed at the use to which the table is appropriated.'"

It seems to us that the evil effects flowing from the use of instrumentalities designed for lawful use, when put to an unlawful use, would be just as great as when such machines were designed for unlawful purposes. Our lawmakers have gone far in their attempt to suppress the gambling evil and in so doing have given our enforcement officers authority to destroy the tools by the use of which gambling is carried on.

In *State* v. *Furth,* 72 Ark. 161, 78 S. W. 759, this court said: "The doctrine of what is known as the 'Fish Net Case,' (*Lawton* v. *Steele,* 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385) is justly invoked, which, in effect, decides that statutes providing for the abatement of nuisances by the destruction of the means used in carrying them on without a judicial trial, and without notice are not unconstitutional, and that a party is not by them deprived of his property without due process."

And in the *Lawton* v. *Steele* case, *supra,* the Supreme Court of the United States, in considering the validity

of an act of the State of New York prohibiting the taking of fish from certain waters and authorizing the summary destruction of nets and other devices for taking fish in violation of the act, said: "It (the police power) is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. . . . The legislature, however, undoubtedly possessed the power, not only to prohibit fishing by nets in these waters, but to make it a criminal offense, and to take such measures as were reasonable and necessary to prevent such offenses in the future. It certainly could not do this more effectually than by destroying the means of the offense. If the nets were being used in a manner detrimental to the interests of the public, we think it was within the power of the legislature to declare them to be nuisances, and to authorize the officers of the state to abate them. . . . Nor is a person whose property is seized under the act in question without his legal remedy. If, in fact, his property has been used in violation of the act, he has no just reason to complain; if not, he may replevy his nets from the officer seizing them, or, if they have been destroyed, may have his action for their value."

The Supreme Court of Illinois in *Glennon* v. *Briton,* 155 Ill. 232, 40 N. E. 594, held: "The purpose of the statute is to stop the unlawful and immoral practice by destroying the implements with which it is carried on. The theory with respect to the property is that no one is any longer the owner of it. The moment it is used in the unlawful business, it is liable to forfeiture, and although the owner may appear and claim it, he has no greater right in property so used than any other person. . . . For the promotion of the general welfare the state, under its police power, has the undoubted right to adopt the most expeditious, inexpensive, and effective mode of abolishing and abating the same."

As indicated, our lawmakers have made it clear under the laws which they have enacted, *supra,* that it is their

intention to suppress all unlicensed gambling in this state and to this end have directed that the court, in all cases wherein construction of gambling statutes are necessary, shall adopt that construction which "shall be in favor of the prohibition and against the offender."

. We conclude, therefore, that the trial court was in error in holding that the teletype machines in question were not gambling devices and subject to seizure and confiscation.

The remaining question presented is: Did the appellants have authority to seize and confiscate the machines in question upon a search and seizure warrant, which was not supported by an affidavit? On the facts here, we think they were within the scope of their authority in making the seizure, and could have acted in the instant case without a search and seizure warrant.

Appellee, says appellee in his brief: "owns and operates a commercial printing establishment in the city of Hot Springs, Arkansas. He is engaged in the general printing business. As an adjunct to said business, he operates a telegraphic sports service. For this purpose he maintains in his printing shop two teletype machines."

Appellants, members of the State Police, walked into appellee's place of business, and went unmolested to, and seized the machines, which appellee was operating at the time in a room adjoining his printing business. When the machines were seized, "information was being received relating to horse races at the different tracks in the United States concerning the entries in said races, track odds, the names of the winning horses, and the horses that placed and showed. There were two operators relaying the information to the various places . . . with a continuous line of information until the races had been completed." It is clear, therefore, that appellee by the use of these machines, was aiding and abetting in the operation of the various gambling houses and committing a felony in the presence of these officers. The teletype machines in view of the use to which they were put by the appellee were gambling devices within the meaning of our statute and were subject to confiscation by the state

authorities. In these circumstances, appellants were clothed with the authority to arrest appellee and seize and confiscate the machines, since the crime was being committed in their presence.

Appellee cannot complain that no arrest was made at the time of the search and seizure. Appellants had the right to arrest, along with the search and seizure, but the right to search and the validity of the seizure did not depend on the arrest of appellee when the search and seizure were made. In *State* v. *District Court, etc., Gallatin County,* 72 Mont. 77, 231 Pac. 1107, (Supreme Court of Montana), it was held: "Defendant on whose premises a still and mash were seized could not complain that he was not arrested as required by Rev. Codes 1921, § 11106, or that sheriff did not perform fully duties imposed on him by law."

This court, in *Van Hook* v. *Helena,* 170 Ark. 1083, 282 S. W. 673, after quoting with approval from *Boyd* v. *United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746, said: "The protection of the search and seizure clause of the Constitution does not extend to the entry of an officer into a public place to make an arrest upon probable cause that an unlawful act is being committed there. The protection applies, not to all premises or property, but only to dwelling houses or other such private places."

We fail to find, on the facts here, that appellee's constitutional rights have been invaded. For the errors indicated, the judgment is reversed and the cause remanded, with directions to proceed in a manner consistent with this opinion.

SMITH, J., concurs.

McHANEY, J., did not participate.

ROBINS, J., (dissenting). I respectfully dissent from the majority opinion in this case.

I cannot agree that these teletype machines, located in a room which was part of Muncrief's printing office, were gambling devices. Certainly they were not made for gaming. They are merely typewriters operated by remote control over telegraph wires. Such instruments are to be

found in nearly every telegraph office and in many newspaper establishments. The machines involved herein were not found in use in any gambling house.

Muncrief received over these machines information about horse races being run at the various tracks in the United States. In so doing he violated no law. This information he used in three ways: First, he transmitted it to certain gambling houses in Hot Springs; second, he transmitted it to a newspaper in that city; and, third, he used it in printing handbills concerning the races, which he sold to the public. Under no statute of this state could it be said that either of the two last mentioned uses of this teletyped news made by Muncrief was illegal. In the absence of legislation forbidding the receiving and transmitting of information about horse racing and outlawing devices which receive and transmit such information, these teletype machines were not, in my opinion, subject to seizure and destruction.

The only case in which the right of officers in enforcing laws against gambling to seize a teletype machine has been passed on by an appellate court is that of In re *Teletype Machines,* 126 Pa. Super. 633, 191 Atl. 210, decided by the superior court of Pennsylvania in 1937. In that case it appeared that such a machine was seized by the officers in a "bookmaking" establishment. The trial court ordered its destruction as a gambling device, but this judgment was reversed by the supreme court, which held (citing as authority the definition of a gambling device given by the supreme court of Arkansas in the case of *State* v. *Sanders,* 86 Ark. 353, 111 S. W. 454, 19 L. R. A., N. S., 913) that the teletype machine was not a gambling device.

So far as I have been able to discover, no court of last resort has ever before condemned as a gambling device an instrument not made for gambling, not used to gamble on, and not located in a gambling house.

Nor can I agree that the constitutional requirement (§ 15, art. II of the Constitution of Arkansas) that a search warrant may be issued only on oath or affirmation is one that the legislature, or the courts, may properly

disregard. The issuance of search warrants and the seizure and destruction thereunder of private property constitute a drastic, summary, and highly penal procedure. The requirement in the Constitution that someone should make an oath or affirmation as the basis for such a proceeding is a reasonable one. It is a valuable safeguard of the citizen's rights, and is, in my judgment, a sane and proper limitation upon what, without it, might become a dangerously abused power.

"A search warrant cannot be lawfully issued unless the grounds on which it is based are supported by oath or affirmation of the complaining party." 47 Am. Jur. 519.

"Before a valid search warrant may issue there must be an application therefor under oath or affirmation in proper form showing probable cause for the issuance of the warrant." 56 C. J. 1211.

The suppression of gambling is important. But it is not more important than maintaining in all their pristine vigor those constitutional safeguards which our forefathers in their wisdom created for us after they had bought with "blood, sweat and tears" the right to erect for themselves and us a constitutional system of free government.

The principles enunciated in judicial decisions cannot be limited in their effect to the precise question then being determined by the court. And I fear that this whittling away by judicial decision of constitutional rights of the individual, even in the praiseworthy effort to suppress gambling, may some day bring about evils not now foreseen. A dictator-minded executive, backed up by a submissive legislature, might conceivably use the decision in the instant case as authority to raid and destroy plants of "opposition" newspapers, and justify such oppressive acts on the ground that the news or editorials published in the papers were, in the judgment of those in power, harmful and subversive to public welfare. Nothing is more essential to preservation of liberty than freedom of the press. The framers of the Constitution of Arkansas wisely wrote therein: "The liberty of the press shall forever remain inviolate. The free communication of

thoughts and opinions is one of the invaluable rights of man.'' This constitutional mandate ought to be upheld against any form of encroachment.

McFADDIN, J., (dissenting). In order to reach its conclusion, the majority of the court must necessarily find and hold, *inter alia*: (1) that the teletype machines were gambling devices; and (2) that the warrant issued by the justice of the peace was in conformity with constitutional requirements. Regardless of the other holding of the majority (concerning which I am not now speaking), I find it impossible to agree to the two points above. Therefore, I respectfully dissent and present my views:

I.  *The Teletype Machines Were Not Gambling Devices.*  The agreed statement in this case says:

''The machines which were seized were ordinary telegraph instruments designed for the purpose of receiving telegraphic information by wire and transcribing same. The machines seized in this case are no different from any other telegraph ticker machine, and the machines may be exhibited to the court as evidence.

''No gambling of any kind was carried on in the premises occupied by plaintiff and in which the machines seized were located. The plaintiff does not own or operate any gambling establishments whatsoever, and has no connection with any gambling establishments, except as hereinbefore stated. The consideration paid to plaintiff by his customers is in payment for information furnished and the amount thereof is a certain fixed amount and does not depend upon the success or failure of any business conducted by his customers.''

And again: ''The said two ticker machines were *primarily used* for obtaining information to be furnished to said places above mentioned. However, the plaintiff did also furnish the same information to a daily newspaper published in Hot Springs, Arkansas, and also used said information in his printing business for the purpose of printing circulars and handbills concerning races. Plaintiff was paid for furnishing this information.''

And again: ''The plaintiff is a resident of Hot Springs, Arkansas, and owns and operates a printing

business at 316 Ouachita Avenue, in the City of Hot Springs, Arkansas. That in said printing establishment there were located two ticker tape machines. 'These ticker tape machines were connected by direct wire with the Western Union Telegraph system.''

Thus, it is agreed that these two teletype machines are such machines as any newspaper office might have. They were not located in a gambling house but in a printing office, some distance from any gambling house. Appellants say that the teletype machines were the ''heart of the gambling racket.'' If that be true, we have the strange anomaly of the heart separated from the body in an organism. These machines were no more vital to the gambling establishment than was (1) the Western Union Telegraph Company which supplied the information to the machines, or (2) the telephone company whose services were used to transmit the information from the printing office to the bookmaker, or (3) the electric company whose current made possible the operation of the Western Union, the teletype machine and the telephone. If one instrumentality in the chain for the transmission of information can be seized as a part of the gambling racket, then all can be seized; for each is essential to the transmission of information, and one is no more the ''heart of the gambling racket'' than is the other. The power which the majority are giving the police in this case to destroy the teletype machines not found in the gambling house—that power—can in the hands of some unscrupulous official in years to come, be used to destroy newspapers, telegraph offices, telephone lines, and other agencies for the dissemination of information. Under the good intention of destroying the gambling racket, the majority may be creating a frankenstein which will destroy property rights. No court of any other state—so far as I am advised—has held such a teletype machine to be a gambling device. The case of *In Re Teletype Machine,* 126 Pa. Super. 533, 191 Atl. 210 (1937), was a proceeding for the forfeiture and destruction of a teletype machine which had been taken under a search and seizure warrant, and that machine was actually found in the gambling house. Forfeiture of the teletype machine was

sought as an illegal gambling device, but the court refused its destruction, saying:

"A teletype machine is a telegraph machine, which typewrites the telegram as the message is received instead of requiring an operator to receive it in the Morse code and transcribe it. It is in general use in telegraph offices, and the results of its operation may be seen in the typewritten slips pasted on a telegraph blank when delivered. It is, in no sense, an article, device, or apparatus to win or gain money, or at which money or other valuable thing may be played for or staked or betted upon. *It is a machine or apparatus for transmitting or conveying information,* not a gambling device or apparatus. The fact that gamblers may use the information thus received in their unlawful business, for the purpose of making bets or wagers or to pay off or collect on such bets or wagers, does not transform the teletype into a gambling machine, device, or apparatus, such as roulette wheels, rouge et noir tables, faro layouts, wheels of fortune, cards, dice, punch boards, slot machines, lottery tickets, 'numbers' slips or policy sheets, etc."

In the case of *Hagerty* v. *Coleman,* 133 Fla. 363, 182 So. 776, the Supreme Court of Florida was asked to allow a telephone to be destroyed because it was found in a gambling house, and such request was refused because a telephone is not a gambling device. In *Commonwealth* v. *Western Union Tel. Co.,* 112 Ky. 355, 67 S. W. 59, 57 L. R. A. 614, 99 Am. St. Rep. 299, the telegraph company was charged with maintaining a common nuisance because it transmitted over its lines information which allowed a bookmaking house to operate, but the Kentucky court said that the fact that persons receiving the information used it illegally did not make the telephone company a violator of the criminal law. The same principle applies here: Muncrief, operating a printing office, furnished information to newspapers and others; and the fact that some of his customers used the information illegally did not make his machines gambling devices *per se.* The very fact that the information was furnished to newspapers for publication shows that the teletype machine was not used *solely* for gambling. In *Garland*

*Novelty Company* v. *State,* 71 Ark. 138, 71 S. W. 257, Mr. Justice RIDDICK, speaking for this court as to what property could be destroyed under the statute here involved, said: "The statute does not authorize the seizure and destruction of tables or other useful furniture simply because they may be found in a gambling house, or because they may be used in playing cards or other games upon which money is bet, but it permits the destruction of those tables and devices only that are made and kept *solely* for the purpose of carrying on a business which the law forbids. It is, under our statute, a nuisance to publicly exhibit and operate a machine made *solely* for the purpose of gambling, and the Legislature has, by this statute, authorized the abatement of the nuisance by the destruction of the machine."

I have italicized the word "solely" to emphasize that Mr. Justice RIDDICK, in the case cited, recognized that before an instrument could be destroyed it must be used "solely" for gambling. The teletype machines involved in this case were not so used; and the majority, by allowing the destruction of these teletype machines in the case at bar, is opening the door that will allow the destruction of a vast amount of property at the whim of some ill-advised and misguided officer.

II. *The Constitutional Question.* In art. II, § 15, of our Constitution, it is provided: "The right of the people of this State to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized."

I call attention to the fact that the Constitution says that the warrant shall not issue except it be supported by oath or affirmation. The agreed statement of facts herein says:

"The warrant attached hereto constitutes the complete record of proceedings had in connection with the issuance of said warrant. No affidavit of probable cause was filed with or exhibited to the J. P. issuing said warrant."

In other words, there was no written affidavit furnished the J. P. and no showing that any oath or affirmation was ever made in keeping with the Constitution. Article II of the Constitution is the Declaration of Rights, and in that article there was attempted to be asserted the rights of the people against which Legislatures, officers and courts could not encroach. The agreed statement in this case shows clearly that the warrant for the seizing. of the machines did not comply with the constitutional mandates. So the taking was wrongful, and Muncrief is now seeking to recover from the State officials the property that they wrongfully took from him. In *Appling* v. *State*, 95 Ark. 185, 128 S. W. 866, 28 L. R. A., N. S., 548, we held that where the officer served a search warrant, the citizen could not resist on the ground that the warrant was wrongfully obtained and that no affidavit was made. In that case, the court took away from the citizen the right to resist the officer, and that naturally meant that the citizen had some protection from the court. The majority is now taking away from the citizen the ultimate right to regain his property that has been wrongfully taken from him. The effect of these two cases together means that if an officer with a void search and seizure warrant takes the property of the citizen, the citizen cannot resist the officer at the time, and cannot later recover his property. Such a holding is so foreign to my ideas of the rights of citizens that I must and do disagree with the majority holding to that effect. Under the good intention of destroying the gambling racket, the majority may be setting up a precedent that undermines the constitutional guaranties of property. Long after the present officials have passed from the scene of action—long after the writer of this dissent has joined his ancestors—the holding of the majority in this case will be cited as a precedent to justify courts in refusing to allow citizens to recover their property wrongfully taken. There must be a stopping point somewhere; and the time has come when I am ready to cry "halt" against the encroachments of a government on a citizen. That is the purpose of this dissent.