ALBRIGHT v. KARSTON.

4-7749                                    190 S. W. 2d 433

Opinion delivered November 19, 1945.

*Guy E. Williams,* Attorney General; *Cleveland Holland* and *Elmo Taylor,* Assistant Attorneys General, for appellant.

*Jay M. Rowland,* for appellee.

ROBINS, J.   Appellees filed complaint against appellant, Gray Albright, superintendent of State Police, alleging that he was unlawfully retaining certain sums of money, aggregating $6,400, which appellant had taken from their establishments in Hot Springs; that said moneys were taken for use as evidence against appellees and there was no authority under the law for confiscation of said moneys; and they prayed that the money be ordered paid into court, so that same might be properly disposed of upon the termination of any charges against appellees as a result of the raids in which the money was taken.

By amendment there was added to the complaint an allegation that the said Albright had resigned as superintendent of State Police, but was still holding the said moneys, and in the amendment judgment for $6,400 against Albright in his official capacity and individually was asked.

Demurrer to this complaint, filed by the Attorney General on behalf of the superintendent of police, being overruled, there was a further amendment in which the amount of money taken from each of the appellees respectively was set out and judgment in favor of such appellees for these respective amounts was prayed.

Thereafter, Albright filed an answer, denying all allegations of the complaint and amendments thereto and also a "cross-complaint" in which he averred that the money held by him was taken by members of the State Police, while raiding the gambling houses of appellees, the money being used at the time in the operation thereof; and that "such moneys are subject to be and should be forfeited by plaintiffs to the State of Arkansas." There

was a prayer for "an order . . . declaring such moneys a forfeit and ordering the clerk to pay same into the state treasury."

At the time of filing his answer, Albright paid to the sheriff $5,718.34, the amount admitted by him to be in his hands, which he alleged "was taken from the plaintiffs herein in connection with various raids upon their places of business," and the court made an order finding that he had "deposited said sum of money with the court to be disposed of according to law," and discharging "Albright, both in his former official capacity as Superintendent of State Police, and in his individual capacity . . . from all liability therefor."

The case was tried upon the following agreed statement of facts:

"1. That the money in question in this action was taken into custody by the defendant, Gray Albright, acting as Suprintendent of the State Police and by other members of the State Police force under the direction of the said Gray Albright in various sums from the different places being operated in the City of Hot Springs, Arkansas, by the plaintiffs, and upon various occasions.

"2. That at such places being operated by the plaintiffs, and at each of them, turf exchanges or pool rooms, commonly called bookies, were maintained and operated, where money was received, bet, won and lost on horse races, and where tickets for pools on horse races to be held and run in this state and elsewhere were bought, sold and cashed.

"3. That at the various times when the members of the Arkansas State Police made such raids they seized the money and property involved in this case while the said places were being operated by plaintiffs as set out in paragraph two hereof.

"4. The various parties plaintiff from whom the money was taken by the defendant and his agents were charged with the offenses of operating gambling houses and with gaming, and were arrested and required to make

bond and appeared in Municipal Court and their cases were submitted to the Garland County Grand Jury.

"5. That the Grand Jury returned no true bills against any of the plaintiffs herein.

"6. That there are no charges pending against any of the plaintiffs.

"7. The defendant, Gray Albright, has paid the sum of $5,718.34 into the registry of this Court and same is all of the money seized by defendants upon said raids from plaintiffs."

The following judgment was rendered by the lower court:

"On this 7th day of May, 1945, this matter is presented to the Court upon the complaint and amendments thereto, answer and cross-complaint of the defendant and an agreed Statement of Facts, which is this day filed herein; from all of which the Court finds:

"That the State of Arkansas is not entitled to any of the money or property involved herein as a forfeit or otherwise, and that the cross-complaint of the defendant should be dismissed.

"It is therefore considered, ordered and adjudged by the Court that the cross-complaint of the defendant be, and the same is hereby dismissed, to which action of the Court, the defendant at the time excepted and prayed an appeal to the Supreme Court of Arkansas, which appeal is, by the Court granted, and the defendant allowed sixty days time in which to tender and file his Bill of Exceptions herein."

The money involved herein was seized by the State Police under authority of search warrants which were issued in pursuance of § 3327 of Pope's Digest: "It is hereby made and declared to be the duty and required of the judges of the Supreme Court, the judges of the circuit courts and of the justices of the peace, on information given or on their own knowledge, or where they have reasonable ground to suspect, that they issue their warrant to some peace officer, directing in such warrant a

search for such gaming tables or devices hereinbefore mentioned or referred to, and directing that, on finding any such, they shall be publicly burned by the officer executing the warrant."

For reversal of the judgment of the lower court the Attorney General urges that the money was a part of the paraphernalia used in the operation of the gambling houses by appellees and that appellees had by their wrongful and unlawful use of these sums of money converted same into gambling devices. In support of this contention he cites our decisions in the case of *State* v. *Sanders*, 86 Ark. 353, 111 S. W. 454; and *Albright* v. *Muncrief*, 206 Ark. 319, 176 S. W. 2d 426.

The question to be decided in the *Sanders* case was whether a pool table, upon which the ordinary game of pool might be played without any wagering on the part of the players, but which was shown in that case to be used in games on which bets were made, was a gambling device, within the meaning of the provisions of § 3327, *supra*. The court held that such table was shown to be a gambling device, saying: "A gambling device is an instrumentality for the playing of a game upon which money may be lost or won; and the instrumentality is not necessarily intended solely for gambling purposes."

In the *Muncrief* case the court held that teletype machines, over which bookmakers received racing information used by them in unlawfully accepting wagers on the results at race tracks throughout the country, might be seized and destroyed as gambling devices. In both of these Arkansas cases the court was dealing with *instrumentalities* through and by means of which the gambling operations were actually being carried on—not with the money or property that was bet by the players.

The precise question posed by this appeal has not previously been passed on by this court, and, so far as we have been able to discover, the legality of the seizure of money, used in gambling, by officers raiding the places where the gambling was carried on has been considered by the courts of other states in only five reported cases:

*Rader* v. *Simmons,* 264 App. Div. 415, 35 N. Y. S. 2d 573; *People* v. *Mettlemen,* 155 Misc. 761, 281 N. Y. S. 474; *Miller* v. *State,* 46 Okla. 674, 149 P. 364; *Davis* v. *State,* 165 S. W. 2d 757; and *Dorrell* v. *Clark,* 90 Mont. 585, 4 P. 2d 712, 79 A. L. R. 1000.

In the *Rader* case, the court, construing a statute which authorized the seizure of any "device or apparatus for gambling," said: "Obviously money does not come within this definition, nor is it included under the classification of other 'apparatus or article, suitable for gambling purposes,' within the meaning of the statutes."

To the same effect was the holding in the *Mettlemen* case, wherein the court said: "A 'device or apparatus for gambling' is a device or apparatus designed for carrying on the actual gambling . . . The money and the two diamond rings contain no scheme for gambling, nor are they a device or apparatus for determining who shall win or lose in gambling."

In the *Miller* case the supreme court of Oklahoma, construing a law providing for seizure and destruction of "articles or apparatus, suitable to be used for gambling purposes" held that money seized by the sheriff, along with a poker table, dice table and other gambling paraphernalia, was not within the purview of this statute. The court in that case said: "We do not think that 'money' comes under the classification of 'articles or apparatus, suitable to be used for gambling purposes.' Men do not, save in a sense, gamble 'with,' but 'for' money."

The *Davis* case involved a statute of Texas in which confiscation of money found by officers in a "gaming house" was authorized. The court in that case held that the money, which was seized by officers in a raid on a poker game carried on in a hotel room, could not be confiscated because the room was not a gambling house. This case, of course, is not analogous to the case at bar, but is of some relevancy as showing that at least one state has a statute expressly authorizing forfeiture to the state of money found in gambling places.

Nor is the question decided in the case of *Dorrell* v. *Clark*, 90 Mont. 585, 4 P. 2d 712, 79 A. L. R. 1000, the same as that involved here. In that case the owner of gambling (slot) machines brought suit for money which the sheriff took from these machines after he seized them in the plaintiff's place of business. The court denied recovery of the money to the owner of the slot machines, emphasizing that the sheriff did not know that the money was in the slot machines until he had taken charge of the latter, and that it was necessary for him to take the money while he was taking the machines. Furthermore, as the court pointed out the coins dropped in the machine caused the operation thereof, thereby becoming a part of the gambling device. The court in that case did not indicate what final disposition should be made of the money, being content to base its position on the broad rule that "whatever may or may not be done with the money in the custody of the court, the power of our courts, either at law or in equity, cannot be invoked in aid of one showing a violation of the law, to complete the illegal transaction and secure to the violator the fruits of his outlawry."

But, in the case at bar, we are not dealing with any asserted right of the gamblers for return of the money. We are only considering the appeal of the state from a dismissal of its cross-complaint, asking for a forfeiture of the money to the state. We are not asked to decide whether the gamblers shall have this money, because the lower court has not ordered its return to them, and the question of final disposition is not before us. We may only determine herein whether the state is entitled to have this money as a forfeit. The sole authority under which property found in gambling houses may be seized is the statute (§ 3327) quoted above. Under this statute there is no power given to the officers to take any property other than "gaming tables or devices." This statute also requires that the seized property must be burned; but the state is not seeking to burn this money—it is seeking only to confiscate it.

The money involved herein cannot be held to be a gambling device or a part of paraphernalia used for gaming; and, since we have in Arkansas no statute authorizing the seizure and confiscation by the state of money used in gambling operations, the courts are powerless to award such a remedy.

The judgment of the lower court is affirmed.

GRIFFIN SMITH, Chief Justice, dissents.

GRIFFIN SMITH, Chief Justice, dissenting. The fact that my six associates agree with all that is said in the majority opinion would ordinarily cause me to doubt the soundness of my views, and to impute to the concepts I entertain an urge to moralize, as distinguished from a duty to correctly declare the law.

But where one's beliefs respecting a transaction that must be dealt with officially reach the dignity of an earnest conviction; and when, as here, the subject is of first impression in Arkansas and there is no domestic precedent to which the term *stare decisis* may attach—in these circumstances there is no discretion behind which I may retire and assert with assurance that my concealment is a reality rather than a fiction.

We are not dealing with the rights of gentlemen who earn their bread by the sweat of their brows. But, even so, those who appear as appellees are entitled to the law's impartial application—fully, effectively, and as completely as though they were engaged in a business impressed with the public welfare. Certainly they are not to be denied equal protection merely because the occupation in which they are engaged is founded upon another's misfortune; a vocation to which the suspicion attaches that mathematical margins and percentages contribute to the travail of customers who in moments of weakness assume there is a chance to win, and who sometimes use their own funds.[1]

Sufficiency of the search warrants, by virtue of which the raids were made, is not in doubt. It is equally

---

[1] *Simpson* v. *Brooks*, 208 Ark. 1093, 189 S. W. 2d 364.

certain that illegal gambling was being carried on in the "Blue Ribbon Club," operated by George Pakis, Gordon Henderson, and Louis Larson (where over a period from January to October, 1944, $2,071.10 was taken in six raids); in the "White Front Club," operated by Tony Karston,—and in such other places as Main Cigar Store, Circle Grill, Pass-Time Club, Reno Club, Milwaukee Bar, Citizens Club, and resorts bearing less dignified and alluring titles. Operating in these establishments (other than those already mentioned) were M. D. Clark, Raymond Tweedle, L. J. R. Wilson, Willie Page, Erb Wheatley, Walter Weldon, Louis Longinotti, Otis McCraw, Tim Crain, and Jack McJunkin.

That the State's interdictions against certain forms of gambling were being openly, flagrantly, brazenly, collusively, coöperatively, and defiantly violated is the only conclusion justified by the record. Effect of the willful conduct engaged in by those who were mentioned, (and, inferentially, by persons having larger interests, but whose identity is not revealed) was, *and still is,* to say that the General Assembly may make laws, but that officials elected and appointed at Hot Springs expect to defy them as the profits or convenience of a particular situation may suggest.

While this challenge to authority, and to the commonwealth's power, was riding the crest of popularity and profit, the Governor sent units of the State Police to Garland County, with the result that nearly six thousand dollars in gambler money was taken from the tables of these social mutineers; and it now forms the subject matter of this appeal.

To repeat, these gambler-claimants are not to be denied equal protection because their gains must necessarily result in another's loss. There are circumstances in which the act of receiving money from A, and on condition giving it to B, meets legislative approval. As to rights acquired through *legalized* gambling there is protection. But we are not now concerned with authorized machinations. The question is, Does money used in gam-

bling houses for the sole purpose of implementing the prohibited transaction come under the statutory ban?

The decision in *Albright* v. *Muncrief*, 206 Ark. 319, 176 S. W. 2d 426, was that a teletype (through which racing data were received and relayed) was not a gambling device *per se;* but if used for the purpose of transmitting information without which betting would have been restricted, the teletype then became a gambler's aid; and when matter passing through the machine was delivered to the so-called ''bookies,'' the instrumentalities were subject to confiscation and destruction.

This statement appears in the Muncrief opinion: ''While [appellee, a printer in whose office teletypes were operated], was not physically present with the machines in question, in each of the gambling houses, we think he was constructively present with these machines, aiding and abetting the operation of these gambling houses through the use of the machines, and was equally guilty.''

Later the decision says: ''Our lawmakers have gone far in their attempt to suppress the gambling evil; and in so doing have given our enforcement officers authority to destroy the tools by the use of which gambling is carried on.''

This declaration of the law, no doubt, had reference also to section 3335 of Pope's Digest, providing that ''The judges of the several courts in this State shall, in their construction of the statutes prohibiting gaming, construe the same liberally, with a view of preventing persons from evading the penalty of the law, by changings of name, or the invention of new games or devices, that now are or may hereafter be brought into practice in any and all kinds of gaming, and all general terms of description shall be so construed as to have effect *and include all games and devices as are not specifically named,* and in all cases, when construction is necessary, it shall be in favor of the prohibition and against the offender.''

But, in effect it is said by the majority, *money* is not a device, even though the game in question, or the wager it sustains, would otherwise be useless.

One of Webster's definitions of money is ". . . anything customarily used as a medium of exchange and measure of value, as sheep, wampum, copper rings, quills of salt or of gold dust, shovel blades, etc."

We are more concerned with legislative intent than with abstruse definitions. But, says the majority opinion—and this appears to be the basis upon which the defiant appellees are being reimbursed—"The money involved herein cannot be held to be a gambling device or a part of paraphernalia used for gambling, . . . *and the Courts are powerless to award [the remedy requested]."*

Assuming that the lawmakers, in their choice of terms, used the word "device" in the exact sense my associates have construed it,—still, the statutes do not end there; and I cannot agree that "the Courts are *powerless."* Again we have recourse to recognized authority. Formerly "paraphernalia" was the property (other than dower, marriage settlement, etc.) which at common law remained, more or less, under the control of a married woman, and which did not pass into the administration of the husband's estate upon his decease before her.— "Personal belongings, such as equipments, finery," and the like.

Ballentine's Law Dictionary speaks of personal ornaments, jewelry, and individual adornments peculiar to the woman's station in life. Paraphernalia embraced diamonds and other precious stones, as well as ornaments standing in the place of value or wealth.

It may rationally be presumed that this Court's majority has in mind that money, as such, is inanimate, cold, and bleak; and that it is barren of that capacity to corrupt which must exist under the General Assembly's conception of "device," or "paraphernalia." But the same legislative authority that tried (through the use of language stronger than is ordinarily used) to *divest* the

operator of a gambling house in respect of instrumentalities essential to his profession, and to deprive such gambler of the means by which he enforces financial stricture—that same authority directed Judges and Courts to declare the law *liberally,* ". . . *and all general terms of description shall be so construed as to have effect, and [such general terms shall include] all . . . devices as are not specifically named.*"

A work regarded as of preëminent value since a first edition was published in 1852 is Roget's Thesaurus of English Words and Phrases. It presents "paraphernalia" under two divisions—machinery, and belongings. The majority opinion accepts one classification and rejects the other. Under "property," Roget lists ". . . assets, belongings, means, resources, circumstances, wealth, money."

March's Thesaurus Dictionary—"A Treasure House of Words and Knowledge"—divides paraphernalia three ways: ornaments, instruments, and property. Included in property is money—"the medium of exchange."

I think we were correct in holding that machines leased by a printer and operated in distant cities became gambling paraphernalia when words reproduced by electrical impulses were transcribed on paper and the information, as the opinion says, was "relayed to various places in Hot Springs . . . where public betting was carried on."

The teletypes were devices or paraphernalia used by the gamblers, even though words, figures, and sentences were the product. Still, bookmakers relied upon the knowledge so obtained and thereby took their dollar tolls. In the case at bar money was the means by which the opposing interests of gambler and victim were represented. The table upon which this money was placed, if that were the method employed; the "chips" or tokens standing for money; the lamp illuminating the game; chairs upon which customers were seated; the carpet adorning the floor, and electric fans—these and other paraphernalia, including the scrap of paper delivered by

Muncrief when his teletype functioned—were subject to confiscation and destruction: but money, the admitted objective of manipulation—the reward for all that gave rise to the law's miscarriage—money must remain inviolate and be returned to the malefactors as the tools of their trade.

Why?

Because "the Courts are powerless."