BURNSIDE, KAY AND HONEYCUTT *v.* STATE.

4671                                                243 S. W. 2d 736

Opinion delivered November 26, 1951.

*Sam Montgomery,* for appellants.

*Ike Murry,* Attorney General and *Dowell Anders,* Assistant Attorney General, for appellee.

HOLT, J. A jury found appellants guilty of "keeping a gaming device under § 41-2003," Ark. Stats. (1947), and assessed a fine of $100 against each appellant. From the judgment is this appeal.

For reversal, appellants make but one contention, and that is that the evidence was not substantial and sufficient to support the jury's verdict and the judgment rendered. We hold that appellants are correct in this contention.

The charge here being a misdemeanor, appellants in electing to argue but the one point have waived all other assignments of errors in their motion for a new trial. *Branton* v. *State,* 214 Ark. 861, 218 S. W. 2d 690.

The essential facts appear not to be in dispute.

On the night of March 10, 1951, appellants, Kay and Honeycutt, were arrested by Little Rock Police and says the State: "At the same time and place, Lieutenant Kerr confiscated from the car of one George Foster, certain electrical equipment, to-wit: a tape recorder, a ticker or teletype machine and a radio transmitter.

"The following day, appellant, James Burnside, was arrested by Captain Albert Haynie of the Little Rock Police Department and Deputy Prosecuting Attorney, John Bailey, at the Colonial Tourist Court, and was also placed in the City Jail. At this time, the officers discovered in appellant Honeycutt's car, which was parked at the Colonial Courts, a set of pole climbers, wire and an extra set of license plates. . . . Only one of the appellants, James Burnside, chose to take the stand in his defense and he denied that the equipment was to be used for gambling purposes or that it was ever in his possession."

John Bailey testified: "Q. What statement did he make? A. I don't recall whether I was riding in the back or the front seat of the car, but I turned to Burnside and asked him if he was a radio technician and the radio technician in this job and he said yes he was. We returned to headquarters and I didn't question Burnside further. . . . A. I talked to Honeycutt. Q. What statement did he make at that time? A. We were in the back room of the detective headquarters, and I was talking to Honeycutt about his association with this particular job and this equipment and he again stated that he didn't know anything about the equipment himself or how it was used. He stated that he was the man that was to go in the bookie joint and place the bets and that Burnside was the radio technician and that Kay was the electrician in the matter. Q. Did he state to you he would receive the information? A. He said he didn't know exactly how they hooked all this up, but that he was to enter the bookie joint with the microphone receiver here (indicating) and in that way get the advance bets on the bookies."

Officer Haynie testified: "We brought Burnside to headquarters and he admitted to us that he knew how to work this equipment and that it had been in his possession. . . . A. His part was supposed to try to get to this ticker wire, the way I understand it—I am not clear on that—and get the racing results and then this recorder would play it back. When he hooked on to this wire, it automatically cut it off in the building when it was coming through from the track," and Officer Potts testified: "Q. What did Burnside state to you? . . . A. Yes, his explanation to me was that they would take this equipment and cut in on the public address system or transmission wire that was carrying racing results back to the place where their man was supposed to be stationed and that they would cut in on this information as it was broadcast from (to) the bookie joint and in some way they would delay this message a few seconds and they had a portable transmitter and they would transmit to their man in the bookie joint and tell him which horse

came in and he would place the bet and by delayed action they would send this information in.'' The record clearly shows that Officer Potts' testimony relates to an intended use rather than a past use.

It is conceded that the equipment here involved was not a gaming device *per se,* but the State earnestly argues that ''it is not necessary that the illegal use be actually undertaken but that it is sufficient if it is shown that gambling was intended to be carried on with the equipment, . . .'' that it ''was intended to be used for an illegal purpose and thus falls within the statute.''

In support, the prosecution relies especially on the case of *Albright* v. *Muncrief,* 206 Ark. 319, 176 S. W. 2d 426, and *Bell and Swan* v. *State,* 212 Ark. 337, 205 S. W. 2d 714. These cases are distinguishable on the facts. In the Albright-Muncrief case, the equipment, teletype machines, not only had been used but were being used as gambling devices at the time of the arrest. Here, there is no evidence at all that the equipment here involved had ever been used for gambling purposes. We held in the Albright-Muncrief case that the above gambling statute is ''aimed at the use'' to which the teletype machines were appropriated. We there said: ''The use to which these machines were knowingly put by appellee, for pay, was the principal factor in the present, most modern operation of the various gambling houses to which he furnished the service.''

We decline to extend our holding in the Albright-Muncrief case to make it a crime to have in possession equipment,—not *per se* a gambling device, merely intended to be used in gambling. Intent, alone, is not enough. It is the use to which the equipment, not *per se* a gambling device, is appropriated that governs. In the Bell case, slot machines, conceded to be gaming devices *per se,* were involved and it was there held that the possession or the keeping of such machines alone is made a misdemeanor and outlawed under the above statute.

In the *Cascio* v. *State* case, 213 Ark. 418, 210 S. W. 2d 897, equipment not *per se,* burglary tools, was shown

to have been used in an attempt to commit burglary. Here, as indicated, there is no showing that the equipment was ever used as a gambling device.

Finding no substantial evidence to support the jury's verdict, the judgment must be, and is reversed, and the cause dismissed.

GRIFFIN SMITH, C. J. (dissenting). I agree that the judgments should be reversed, but dissent from the order of dismissal. The majority opinion contains this quotation from the testimony of Officer Potts: "[Burnside's] explanation to me was that they would take this equipment and cut in on the public address system or transmission wire that was carrying racing results back to the place where *their* man was supposed to be stationed and that they would cut in on this information as it was broadcast[ed] from the bookie joints and in some way they would delay this message a few seconds; and they had a portable transmitter and they would transmit to their man in the bookie joint and tell him which horse came in, and he would place the bet, and by delaying action they would send this information in."

It will be observed that the word "would" was used by Mr. Potts. Whether he intended to say that the effect of Burnside's admission was that the equipment *was* being used, or *had* been used, or *would* be used for illegal purposes is not certain. The jury could have believed the former, and in that event there was substantial evidence to support the verdict. Because of the ambiguity, however, I would reverse and remand for a new trial. I therefore dissent from the order of dismissal.