## Jacob Zeller v. Lawrence White.

106 183
a208s 518

1. PRACTICE—*Leave to Amend.*—Leave to amend is not equivalent to an amendment.

2. GAMBLING—*Keeper of House Liable Although His Agents Do Not Win Every Hand at Draw Poker.*—A keeper of a gambling house is responsible for the losses of a person at draw poker, under section 132 of the criminal code, although it is not claimed that his agents won every hand, but only that at the end they had won all except a few dollars.

3. PENAL STATUTES—*To Recover Money Lost at Gambling Not to be Too Strictly Construed.*—Although statutes to recover money lost at gambling are penal they should not be construed with unreasonable strictness, but should have a just, if not liberal construction, to the end that the legislative intent may be accomplished.

Assumpsit, to recover money lost at gambling. Appeal from the Circuit Court of La Salle County; the Hon. HENRY M. TRIMBLE, Judge presiding. Heard in this court at the October term, 1902. Affirmed. Opinion filed January 27, 1903.

HENRY M. KELLY, attorney for appellant.

GEORGE H. HAIGHT, attorney for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

In October, 1901, Jacob Zeller ran a gambling house upstairs over his saloon in Ottawa. Lawrence White brought this suit to recover money lost there in a game of poker. The declaration consisted of the common counts. Defendant pleaded non-assumpsit. Plaintiff obtained a verdict and a judgment for $70. Defendant appeals.

It is enacted by section 132 of the criminal code that if any person shall, at any time or sitting, by playing at cards or any other game, or by a bet upon any pastime, lot or' chance, "lose to any person so playing or betting any sum of money or other valuable thing, amounting in the whole to the sum of $10, and shall pay or deliver the same or any part thereof," he may sue and recover the money so lost or paid "from the winner thereof," in assumpsit or other specified actions, and that in assumpsit it shall be sufficient to declare generally for money had and received by defendant to plaintiff's use, "without setting forth the special matter." It is argued that this declaration should have referred to the criminal code. Before defendant pleaded he procured a rule under which plaintiff filed a bill of particulars showing the suit was to recover money lost in gambling. Defendant did not then demur, but pleaded the merits. Defendant argues he raised the point on his motion made at the close of plaintiff's proofs in chief, to instruct for defendant. The bill of exceptions sets out the argument of his counsel on that motion. He does therein allude to the fact the statute is not referred to in the declaration, but he does not suggest that his motion should be granted for that reason. His argument grounded the motion on an alleged variance, because the proof was the loss was not directly to defendant. The written instruction then offered was to the same effect. The record does not show defendant raised this point distinctly in the court below. If he had done so, plaintiff might have amended the declaration. The declaration seems to be sufficient, under Pearce v. Foote, 113 Ill. 228, and certainly is good after verdict.

Plaintiff's proof tended to show that certain employes of

defendant played for him in his gambling house with his money, as his agents; that on the night in question defendant gave plaintiff a drink of whisky and then invited him upstairs to a game; that plaintiff went up about ten o'clock in the evening and sat down to a game of draw poker with jack pots, and played till five o'clock next morning or a little later, and lost $80 during the game; that money was not handled at the table, but chips purchased of one of defendant's servants in the house; that three at least of defendant's said employes were in the game, and some other persons; that said other persons quit the game earlier and either lost or quit about even, one of them having won $3; that at the close of the game defendant's employes had won all the chips and cashed them in, being all the winnings of the entire evening, except the one or two small sums won by others already mentioned; that defendant was absent all night, but came in just as the game broke up, and said he had just come from La Salle; that said employes then turned over all said winnings to defendant; that he placed them in his safe, and that they were his. Defendant admitted keeping the gambling house, that his men sold the chips, and that one of them had authority to play for the house, that is, for defendant, but he claimed that employe did not play for the house that night; and he introduced proof that if his other employes played, it was with their own money, or with money borrowed of the house and put on a tab and deducted from their salaries if they lost. He denied any money was turned over to him that morning. He introduced proof tending to show one of these third parties won and carried away a large sum that night, instead of quitting even, as shown in plaintiff's proofs, and his proof in various respects contradicted that introduced by plaintiff. In deciding these issues of fact, the jury were warranted in considering not only the positive testimony *pro* and *con*, but also various circumstances and incidents appearing in the proof. For example, plaintiff introduced proof that defendant told plaintiff's father the tabs showed plaintiff lost only $80 instead of a larger sum

it is alleged he was claiming. How tab came to be thus kept upon plaintiff for the use of defendant while defendant's servants were playing and winning only on their own account is not explained, save that defendant denied he kept tab on any one except his own employes. Defendant, when testifying as a witness for plaintiff, stated that while he was running this house his winnings during the nights he was absent were put into the safe; that sometimes he put them in and sometimes his employes put them in, and he did not remember who put them into the safe on this particular morning. When testifying as a witness for himself he stated that the money obtained from these games was put away in the safe by himself or by one of the house men who happened to be there when the game quit, and that the money so put away in his safe was his own money. He also testified he kept a book for the full house winnings or losings for the day, but he burned it when he was closed up, as he did not care to have it lying around. It therefore appears that the house generally had winnings or losings; that defendant had destroyed the book which would have shown what winnings defendant's house made at the time in question; that the house was accustomed to have winnings when defendant was absent, and that those winnings went into his safe as his own money. Various things were implied by defendant and his witnesses not in harmony with their express statements. We do not feel warranted in disturbing the decision of the jury upon these controverted facts.

The proof shows the game was played with chips, got from the house by each player, and those who were not employes paid for their chips when obtained. At the close of each hand some one person had won all the chips in that jack pot, and each of the others had lost to that one. Some one else might win the chips in the next jack pot. It is not claimed defendant's servants won each hand, but only that in the end they had won all that had been won, and the others quit even or lost, except that one or two won small sums of about $3. Defendant introduced proof that it was

not possible to tell who won what a person lost in a particular hand in such a game, unless it was set down at the time. Defendant argues that the person who won a particular hand was the winner and the only winner of what plaintiff lost in that hand, and if that person was not a servant of defendant, defendant could not be held liable for that loss, even if his servants afterward won those chips from some one else. There is force in this position, but if it is correct, it is practically impossible to recover under the statute for money lost at draw poker, as that game is described in the proof before us. Persons playing such games do not set down, at the time, the number of chips lost on each hand and to whom lost, and a person who should undertake to do it would not be permitted to stay in the game. This statute, if applied at all, must be applied in favor of those who repent after they have lost. Another part of the section permits a third person to recover, if the loser does not sue within six months. Shall such a construction be adopted as will take draw poker out of the statute? It was said in Pearce v. Foote, *supra*, though these are penal statutes they should not be construed with unreasonable strictness; that they ought rather to have a just, if not liberal construction, to the end that the legislative intent may be accomplished. That intent, as to the part of the statute here involved, obviously is to prohibit playing cards for money, and to enable the loser to recover his losses. All the provisions of the criminal code on this subject, from section 126 to section 137, both inclusive, evidence that intention. Gambling is there recognized as an evil, and those provisions are designed to operate against it. The evils of gambling are matters of common knowledge. It tempts men to squander the money needed by their families or their business. It tempts trusted employes to embezzle and risk their employers' money in the hope of making great gains. It creates dissatisfaction with the slow rewards of steady industry. It ruins both those who lose and those who win. No one supposes the legislature intended to except draw poker from the operation of the statute.

Gamblers ought not to be permitted to evade the statute by selecting intricate games. No doubt the winner of a particular jack pot could be held liable; but we think we should adopt a sufficiently broad definition of the word " winner " to include those who finally won all the chips and at the close of the game got all the money the chips represented, and all the money won in the game. They were the only ones who left the game " winners," and they actually had all defendant's money—that is, assuming the jury were warranted in believing the proof introduced by plaintiff. The jury allowed plaintiff $10 less than he lost, so that if those who retreated with a few dollars before the game was over are considered as having won them from plaintiff, still the verdict is not too large.

But defendant did not personally sit in the game, nor was he present till just after its close. He claims a person is liable under this statute only for what he personally wins, and not for what may be won by his servants playing with his money for him. If we are to give this act a just construction and one fitted to carry out the legislative intent, we ought not to hold defendant may have all the benefits of successful gambling and yet escape all liability by having others gamble for him with his money, but rather should apply the maxim " *Qui facit per alium, facit per se*" —he who acts through another, acts by himself. Even at the criminal law, he who hires another to commit a crime is responsible for the crime he so procures. We do not think defendant can claim greater impunity in this suit, which is upon the border between civil and criminal actions.

One or two answers were admitted tending to show plaintiff was robbed, or was told so, but all this proof was several times excluded by the court. Plaintiff having testified in rebuttal that one Norris (not one of defendant's servants) was playing money that night which he got from the house, was asked by plaintiff's counsel how he knew, and answered, " He told me so." The court overruled a motion by defendant to exclude this answer. The motion should have been granted. The question was then repeated

and the witness answered he saw Norris get the money. He was cross-examined upon that subject and testified he saw Norris get the money from the house, but would not swear he was playing for the house that night. Defendant afterward was permitted to testify, after the close of the rebuttal, that Norris was never in his employ and never performed any service for defendant at his place of business, and that defendant did not know where he was, but last heard of him in New Jersey. Plaintiff, in his case in chief, had proved Norris played in the earlier part of the game, and defendant had introduced evidence in chief concerning Norris. We conclude the refusal to exclude that one answer should not reverse the judgment, and that defendant's complaint because he was not allowed to trace Norris further in his proof in sur-rebuttal is not well founded.

The bill of particulars read, "To money lost gambling night Oct. 30 & 31, 1901, $100." Plaintiff's proof tended to show the game was played the night of October 31st and the morning of November 1st. Defendant's proof was that it was played the night of October 30th and morning of October 31st. The bill of exceptions recites that during the trial plaintiff was granted leave to amend the bill of particulars so as to make the dates read "October 30th and November 1st," which of course is an error. Leave to amend is not equivalent to an amendment. (Wisconsin Central R. R. Co. v. Wieczorek, 151 Ill. 579.) There is nothing to show plaintiff did in fact amend, except that at the close of the proofs defendant introduced all the files, including the bill of particulars. In the record before us it is there written in typewriting as in the original bill, and changed in lead pencil to read, "Oct. 31 & Nov. 1." We do not suppose these lead pencil marks are a part of the record, but that they were placed there to suggest a correction which was not made. If not, the bill of particulars was not amended, and it states the date on which defendant and his witnesses claim the game was played. No question arises on this record whether plaintiff could recover if the jury found the

game was played on a different date from that named in the bill of particulars. No instruction was asked on that subject. No one was misled by this apparent confusion as to the date finally left in the bill of particulars, for the witnesses who testified about the game all knew in what game it was that White lost his money. He played no other game there near that time. The court should not have refused to permit plaintiff to be asked on cross-examination if he did not testify before the grand jury that this game was played on the 26th or 27th of October. But if he had admitted he did so testify, that would only have shown he was at that time mistaken, for no one claims it was played on either of those dates. It is not controverted that plaintiff did play in defendant's gambling house with defendant's servants either on the night of October 30-31 or of October 31–November 1, and that he lost $80 in that game. We conclude the refusal to permit defendant to put the question above stated ought not to reverse this judgment. Two of plaintiff's instructions are defective, standing alone, but when they are read with the others as a series we do not think the jury could be misled by their omissions.

There are seventeen assignments of error upon this record, of which the last three raise every question argued by defendant. The rest are an unnecessary repetition of the motion for a new trial.

Finding no reversible error in the record, the judgment is affirmed.