SIMPSON *v*. BROOKS.

4-7649                                    189 S. W. 2d 364

Opinion delivered July 2, 1945.

*Buzbee, Harrison & Wright,* for appellant.

*John L. Sullivan* and *E. B. Dillon,* for appellee.

GRIFFIN SMITH, Chief Justice. The Fidelity Company is a partnership engaged in the insurance brokerage business. During 1939 and until June 10, 1943, and prior thereto, Lee Ables was bookkeeper for the Company; and while acting in that capacity he is alleged to have taken more than $39,000. The complaint states that Paul Brooks was a "bookmaker" residing in Pulaski County, where he accepted bets on horse races. During the period in question, Ables is alleged to have paid Brooks "a large proportion" of the money he took from the Company, the exact sum being unknown to the plaintiffs. It was gambled by Ables and won by Brooks. The prayer was that the defendant be required to submit an account showing all sums placed with him by Ables for betting "during the years 1939, 1940, 1941, 1942, and until June 10, 1943; [and] that the plaintiffs have a decree against the defendant for $39,000 or such sums as may be shown by proper accounting to have been paid to [Brooks] by Ables."

In sustaining a demurrer the Court held (a) that a cause of action was not stated; (b) that the relief prayed for contemplated discovery of information which would

subject the defendant to criminal prosecution; and (c) that the Court was without jurisdiction because the plaintiff had an adequate remedy of law.

Appellee contends that under the common law persons who lost money by gambling did not have a right of action for recovery; and that in Arkansas the common law was enlarged (Pope's Digest, § 6112) so that in certain circumstances the loser could sue. The section of Pope's Digest is a part of the Revised Statutes (Chapter 68, § 1), and its evolution is traced by Chief Justice Mc-Culloch in *Lane* v. *Alexander,* 168 Ark. 700, 271 S. W. 710.

The right of action given by Pope's section 6112 extends to persons who lose money or property at any game or gambling device, or through any bet or wager whatever, provided suit is instituted within ninety days after the money or property so lost has been "paid over." The right survives to the heirs, executors, administrators, or creditors of the person who loses in the manner mentioned.

In circumstances such as many of the cases deal with, one whose property is appropriated by a third person in an unlawful manner and delivered to a gambler as the incident of betting, is permitted at common law to recover because ownership has not in fact passed; but not so as to gambling transactions between participants who used their own money.

The basic principle was expressed in *Smith* v. *Ray,* 89 Ga. 838, 16 S. E. 90. It was alleged that the defendant won $840 from a designated person, while engaged in a game of chance called "matching," but that the money belonged to the plaintiff. The City Court of Macon had sustained a demurrer. In reversing this judgment the Supreme Court, in a *per curiam* order, said that the complaint stated a cause of action for money had and received, and that the right was referable to the common law.

Mr. Justice Bennett, speaking for the Supreme Court of Vermont in *Burnham* v. *Fisher,* 25 Vt. 514, held

that where a clerk was authorized to borrow money for a merchant and execute notes therefor, proceeds of these loans (and other funds unlawfully taken from the proprietor's store) lost at gambling could be recovered by the merchant, "the same having passed from the clerk into his hands against law and without consideration." The right was given by common law.

An Illinois case is in line with what the Vermont Court held. See *McAllister* v. *Oberne, Hosick & Co.*, 42 Ill. App. 287. Weider, general agent for the appellee at Peoria, drew drafts on his principal at Chicago, in consequence of which money was transferred. Weider lost to McAllister at cards and settled with checks against the Company's Peoria account. Affirming judgment against McAllister, the Court commented that "[McAllister] must be held to have received appellees' money on a gambling debt." Effect of the decision was that the action would lie "under the common counts for money had and received and laid out and expended, etc."

Judgment was affirmed in *Murry et al.* v. *Aull*, 47 Colo. 542, 107 Pac. 1068. The plaintiff had entrusted her husband with a certain fund. He, in turn, deposited it in a bank to his own credit. Murry and others operated a saloon and rented space to Owen, where gambling was conducted. Aull lost a thousand dollars. Owen suggested that Aull have Murry cash his check, and this was done. Murry knew that the money was to be paid Owen to cover Aull's gambling losses.[1]

The Supreme Court of Oklahoma, after carefully reviewing cases applicable to transactions such as we are dealing with, made this statement: "There is no doubt as to the legal proposition that a third person whose money has been lost to another at gambling may recover the same in an action at law against the person

---

[1] The headnote to this case, in 47 Colo. 542, is: "The depositary of money misappropriates it to discharge his losses in gaming. The one receiving the money had notice of the facts. The depositor may recover the money." The opinion proper does not support the statement that "the one receiving the money had notice of facts." There is nothing to indicat that either Owen or Murry and his associate knew that Aull was using his wife's money.

or persons winning or receiving the same." *Becker* v. *Fitch,* 66 Okla. 57, 167 Pac. 202, 2 A. L. R. 340.

In holding that the State was not the proper party to bring suit on behalf of Mrs. William A. Walley to recover money lost by her husband in gambling, the Supreme Court of Indiana held that Mrs. Wallay could have proceeded at common law. *Ervin* v. *State,* 150 Ind. 332, 48 N. E. 249. See, also, *Pollak* v. *Agner,* 54 Kan. 618, 38 Pac. 781.

There is nothing to indicate a legislative intention, through adoption of that part of the Revised Statutes now appearing as Section 6112 of Pope's Digest, to make the remedy exclusive of common law rights, other than in respect of transactions between the immediate parties. It must be held, therefore, that the complaint stated a cause of action. Nor is the defendant privileged under Section 8, Article II, of the Constitution, to refuse to give testimony. While courts cannot compel persons, "in any criminal case to be a witness against themselves," most of the transaction mentioned in the complaint are alleged to have occurred more than three years ago. If indicted or informed against because of disclosures made while responding to judicial direction that discovery be had, the witness so testifying has only to plead limitation in order to avail himself of that security the Constitution gives. Conversely, his plea of limitation against the plaintiffs for debt would not, as a matter of course, be good; for it might be shown (as the demurrer indicates) that Brooks concealed the transactions to such an extent that the plea would be unavailing.

Section six of Chapter 68, Revised Statutes, (Pope's Digest, § 6117) provides that "in all suits under this chapter, the plaintiff may call on the defendant to answer, on oath, any interrogatory, touching the case, and, if the defendant refuse to answer, the same shall be taken as confessed." The next section is: "Such answer shall not be admitted as evidence against such person in any prosecution by indictment."

While these provisions pertain strictly to the statutory transactions and rights set out, there is, in general,

implication of public policy regarding the extent to which immunity of one whose testimony would tend to incriminate him should go. Greenleaf on Evidence, v. 1, p. 600, 15th ed., cites holding that if the lapse of time bars prosecution to which the witness would otherwise be exposed, "he is bound to answer."

The United States Supreme Court (*Brown* v. *Walker*, 161 U. S. 591, 16 S. Ct. 644, 40 L. Ed. 819) had before it an Act of Congress which provided that no person would be excused from testifying . . . before the Interstate Commerce Commission "on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture; but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify. . . ."

It was said in the opinion that the Act was supposed to have been passed to meet the Court's decision in *Counselman* v. *Hitchcock*, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110, to the effect that § 860 of the Revised Statutes (providing that no evidence given by a witness shall be used against him, his property or estate, in any manner, in any court of the United States, in any criminal proceeding) did not afford that complete protection to the witness which the Fifth Amendment to the Constitution was intended to guarantee

In holding that the constitutional protection was "fully accomplished" through the immunity or "general amnesty" provided by the statute, the Court ruled that the witness should testify. It was then said that, as a general rule of law; ". . . if a prosecution for a crime, concerning which the witness is interrogated, is barred by the statute of limitations, he is compelled to answer." *Parkhurst* v. *Lowten,* 1 Merivale, 391, 400; *Calhoun* v. *Thompson,* 56 Alabama, 166, 28 Am. Rep. 754; *Mahanke* v. *Cleland,* 76 Iowa 401, 41 N. W. 53; *Weldon* v.

*Burch,* 12 Illinois 374; *United States* v. *Smith,* 4 Day 121; *Close* v. *Olney,* 1 Denio 319; *People* v. *Mather,* 4 Wend. 229, 252-255, 21 Am. Dec. 122; *Williams* v. *Farrington,* 11 Cox Ch. R. 202; *Davis* v. *Reid,* 5 Sim. 443; *Floyd* v. *State,* 7 Tex. 215; *Maloney* v. *Dows,* 2 Hilt. 247; *Wolfe* v. *Goulard,* 15 Abb. Pr. 336.

Wharton, Criminal Evidence, v. 1, 10th ed., p. 970, mentions (by footnote reference) the rule laid down in *Counselman* v. *Hitchcock, supra,* calling attention to the fact that it was later overruled. He also discusses the holding that a witness "cannot be shielded from the personal disgrace attaching to the exposure of his crime" by reliance on the constitutional provision.

Mr. Greenleaf, in the volume and edition heretofore cited, pp. 599-600, says that in cases where the privilege may be claimed, the right is personal and not that of the party [defendant]; "counsel, therefore, will not be allowed to make the objection."

Wigmore, in his work on Evidence, v. 8, 3d ed., pp. 317-18, comments extensively on abuses to which the privilege against compulsory self-incrimination has been subjected. His view is that the letter of the law should not be enlarged by sentimental considerations. "Indirectly and ultimately," says Wigmore, "it works for good,—for the good of the innocent accused and of the community at large. But directly and concretely it works for ill,—for the protection of the guilty and the consequent derangement of civic order. The current judicial habit is to ignore its latter aspect, and to laud it undiscriminatingly with false cant."[2]

It is finally urged by appellee in his brief that Chancery Court is without jurisdiction. Since discovery —and, within limitations, matters of accountancy—are involved, resort to equity was not inappropriate.

Reversed, with directions to overrule the demurrer.

---

[2] In addition to that part of Prof. Wigmore's comment above quoted, and in connection with the same discussion, he said: "A stranger from another legal sphere might imagine, in the perusal of our precedents, that the guilty criminal was the fond object of the Court's doting tenderness, guiding him at every step into the path of

unrectitude, and lifting up his feet lest he fall into the pits digged for him by justice and by his own offenses.   The judicial practice, now too common, of treating with warm and fostering respect every appeal to this privilege, and of amiably feigning each guilty invocator to be an unsullied victim hounded by the persecutions of a tyrant, is a mark of traditional sentimentality.   It involves a confusion between the abstract privilege—which is indeed a bulwark of justice—and the individual entitled to it—who may be a monster of crime.   There is no reason why judges should lend themselves to confirming the insidious impression that crime in itself is worthy of protection.   The privilege cannot be enforced without protecting crime; but that is a necessary evil inseparable from it, and not a reason for its existence.   We should regret the evil, not magnify it by approval.   . . .   There ought to be an end of judicial cant towards crime.   We have already too much of what a wit has called 'justice tempered with mercy.'   A due respect for the privilege is perfectly consistent with a strict contempt for the guilty offender, and does not require or condone his protection as an end good in itself or good under any circumstances.   It is enough for justice and for the commonwealth that the privilege exists, immovably fixed in the Constitution.   The good which it aims at consists in that general fact and system, and not in the individual application of it to a given claimant.   *That* effects mostly harm,—a particular harm which we suffer for the larger good."