[No. 31273. *En Banc.* June 29, 1950.]

WALTER B. HEITFELD, *as Trustee in Bankruptcy of the Estate of Duncan John MacGillivray, Jr., Respondent,*
v. BENEVOLENT AND PROTECTIVE ORDER OF KEGLERS, *Appellant.*[1]

[1]Reported in 220 P. (2d) 655.

*Geo. W. Young, Allen, Hilen, Froude & DeGarmo,* and *Edge, Davenport & Edge,* for appellant.

*Thomas Malott* and *Jerome Williams,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment obtained against the defendant corporation for losses sustained in gambling games.

The plaintiff commenced action against Benevolent and Protective Order of Keglers, a corporation (hereinafter called Keglers), and Orien W. Gross and Theresa Gross, husband and wife. At the close of the plaintiff's case, a motion was granted to dismiss Gross and wife from the case, and we shall not further concern ourselves with them.

As to defendant Keglers, the amended complaint alleged the adjudication of MacGillivray as a bankrupt in the United States district court for the eastern district of Washington, northern division. This was admitted. It was further alleged that plaintiff was elected and qualified as trustee of the bankrupt's estate, and as such had succeeded to the causes of action alleged; that the action was brought pursuant to the authority of the bankruptcy court. This was

denied. It was further alleged that the defendant was a corporation organized under the laws of Washington and had its principal place of business in Spokane. This was admitted.

It was further alleged that each of the games was opened, conducted, played, carried on and owned by the Keglers, as the proprietor for whose benefit the games were played; that they were games of chance prohibited under § 1, p. 97, Laws of 1879. This was denied.

Then followed thirty-nine causes of action alleging that between February 20, 1945, and November 22, 1946, the bankrupt participated in games of dice at the Keglers in which he lost money. The allegations were briefly as follows: First cause of action, February 20, 1945, lost $1,800; Second, March 26, 1945, $1,157; Third, April 4, 1945, $5,900; Fourth, April 20, 1945, $1,100; Fifth, April 24, 1945, $1,000; Sixth, May 1, 1945, $1,000; Seventh, May 3, 1945, $3,300; Eighth, May 5, 1945, $800; Ninth, May 8, 1945, $400; Tenth, May 11, 1945, $1,500; Eleventh, May 22, 1945, $1,500; Twelfth, June 16, 1945, $1,595; Thirteenth, June 22, 1945, $500; Fourteenth, July 17, 1945, $2,000; Fifteenth, July 23, 1945, $1,343; Sixteenth, September 22, 1945, $4,500; Seventeenth, November 9, 1945, $1,385; Eighteenth, March 26, 1946, $600; Nineteenth, April 2, 1946, $100; Twentieth, April 15, 1946, $1,900; Twenty-first, April 23, 1946, $8,000; Twenty-second, May 17, 1946, $1,400; Twenty-third, July 15, 1946, $4,400; Twenty-fourth, July 23, 1946, $2,600; Twenty-fifth, August 3, 1946, $950; Twenty-sixth, August 10, 1946, $500; Twenty-seventh, August 19, 1946, $1,000; Twenty-eighth, September 5, 1946, $3,300; Twenty-ninth, September 11, 1946, $200; Thirtieth, September 15, 1946, $1,750; Thirty-first, September 27, 1946, $1,530; Thirty-second, October 4, 1946, $2,205; Thirty-third, October 10, 1946, $750; Thirty-fourth, October 21, 1946, $1,500; Thirty-fifth, October 29, 1946, $3,500; Thirty-sixth, November 7, 1946, $5,400; Thirty-seventh, November 15, 1946, $3,500; Thirty-eighth, November 19, 1946, $1,400; Thirty-ninth, November 22, 1946, $19,605. This was all denied.

As a first affirmative defense, it was alleged that any and all causes of action were not commenced within the time required by law, and were barred by the statute of limitations. As a second affirmative defense, it was alleged that all gambling losses, if any, of MacGillivray, occurred in games promoted by him. As a third affirmative defense, it was alleged that MacGillivray won more than he lost. These allegations were denied by plaintiff.

The selection of the jury commenced February 5, 1949, and the jury rendered its verdict March 2, 1949. The statement of facts consists of 880 pages of testimony. One hundred sixty-five exhibits were offered, consisting mostly of checks, deposit books, deposit slips, etc.

MacGillivray testified that his losses were incurred in playing 4-5-6 games in an upstairs room at the Keglers Club, on an egg shaped table with sides on it to prevent the dice from rolling off; that the "bank" would range from $200 to $4,000; that the games were presided over by a stickman, who would take a cut out of the bank every time there was a winning or losing point, or a new bank; that the "rake-off" would be from $40 to $60 an hour; that the games would usually start about ten o'clock in the evening and would sometimes continue into the next afternoon.

As to his losses, he refreshed his memory by referring to checks which he issued to various players or to "cash." By referring to deposit books, he testified as to whether he won or lost on each particular night. One night he won $920 and that cause of action was withdrawn from the jury. In all, fourteen causes of action were withdrawn, either because he could not remember the games, or because the money was used in gambling elsewhere. He owned an interest in the Bonair Club at Coeur d'Alene, Idaho, where he played frequently. He also played the races.

Several stickmen, who were professionals, testified that they were called to the club by Mr. Gross, the manager; that they were paid $10 or $15 for the night's work; that in addition, they sometimes received tips from the players, who told them to put the money in their pockets; that the

"rake-off" or "cut" which was voluntary by the players, and not in any particular amount, was put in a box which was before them; that they got their pay out of the box and that when they left they turned in the box, with what money remained in it, to Mr. Gross or some other employee of the club.

Several members, officers and employees of the club testified for the defendant. Their testimony was that these games were organized by the players for their own amusement, and that the club had no part in them; that the money in the box was donated by the players; that part of the money was used to buy drinks and sandwiches for the players; that any money remaining was divided among the stickmen at the close of each game and that none of it went to the club; that MacGillivray usually promoted the games; that he was a big time professional gambler; that he was in the habit of cashing checks at the club and then taking the proceeds and playing elsewhere; that he was known as a "pack rat" because he would obtain money from players by issuing checks to them and then scoop up his winnings and leave without making the checks good; that he usually won. One of the players testified that he was in New York the night MacGillivray claimed to have lost $1,500 to him.

The testimony was in conflict. In returning a verdict for the respondent on twenty-five of the causes of action pleaded, the jury found that MacGillivray lost a total of $53,095, and that the defendant was the proprietor of the games, which were played for its benefit. We cannot say, from an examination of the record, that the evidence preponderates against such findings.

The main points stressed by appellant are that the right of action for the losses claimed by the bankrupt is an action for the recovery of a penalty to which the trustee in bankruptcy could not succeed; error in giving certain instructions; error in refusing to give certain requested instructions; error in refusing to grant a mistrial because of claimed misconduct of counsel; violation by the court of Art. IV, § 16 of the Washington constitution in commenting on the evidence; and error of the court in refusing to take from the

consideration of the jury certain causes of action claimed not to have been commenced within the time limited by law.

Rem. Rev. Stat., § 5851 [P.P.C. § 116-151], provides:

"All persons losing money or anything of value at or on any of said games shall have a cause of action to recover from the dealer or player winning the same, or proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

11 U. S. C. A. (Sup.), § 110.a. (5) and (6) are the two sections of the Bankruptcy Act setting forth what property of the bankrupt passes to the trustee. The applicable portions thereof specify:

"(5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered: . . . (6) rights of action arising upon contracts, or usury, or the unlawful taking or detention of or injury to his property; . . ."

■ Could these claims have been assigned by the bankrupt prior to his adjudication as such? The right of assignability of the bankrupt's claim must be determined by Washington law. *Charness v. Katz,* 48 F. Supp. 374; *Dooley v. Pease,* 180 U. S. 126, 45 L. Ed. 457, 21 S. Ct. 329.

■ In general, a cause of action for the recovery of a penalty is not assignable unless specifically made so by statute. 23 Am. Jur. 635, Forfeitures and Penalties, § 43. So our first problem is to determine whether this right, granted by Rem. Rev. Stat., § 5851, is remedial or penal in nature. Is it the purpose of the statute to compensate the loser for his losses, or to punish the winner or proprietor for whose benefit the games were played?

At common law there could be no recovery of money lost at gambling, not because the winner acquired title to the money won, but on the theory that both parties had engaged in a wrongful act, and since they were *in pari delicto,* the courts denied either of them any remedy, even though in

equity and good conscience one who profits by an illegal transaction should make restitution. This rule of the common law, as applied to the loser in gambling cases, has been abrogated in varying degrees in every state of the Union. An excellent analysis of the nature of the statutory action to recover money lost in gambling is contained in the early case of *Meech v. Stoner*, 19 N. Y. 26. There the statute permitted a loser of more than $25 to recover his losses from the winner by suit within three months. In holding that such a right of action was assignable and not a mere personal privilege of the loser, the court said:

"To take money from a person by gaming is, in a just sense, a wrong done to his estate. It subtracts from the means of paying his creditors, and in case the person dies, it diminishes the fund which ought to go in a course of distribution to the widow and next of kin. Such a cause of action, according to all the analogies of the law, is capable of transmission and assignment."

The statute in question also provided that if the loser did not sue within three months, the overseers of the poor could "sue for and recover the sum or value so lost and paid, together with treble the said sum or value."

The court said:

"This action is not, like that of the loser, based upon the duty of restoring the money won, but is for a penalty intended to repress the vice of gaming. The statute first provides for restitution between the parties, if claimed within a short period of time; if not so claimed, then the penalty attaches in favor of the overseers."

Other states have given like interpretations to similar statutes. In *Zeller v. White*, 106 Ill. App. 183, 208 Ill. 518, 70 N. E. 669, the loser was permitted to recover from the proprietor for poker losses to the proprietor's housemen, although the statute permitted recovery from the winner only. The court held that the statute was to be liberally construed to give full effect to the legislative intent. See also: *Salzman v. Boeing*, 304 Ill. App. 405, 26 N. E. (2d) 696; *Bodine v. Limberopoulos*, 17 Ohio Op. 149, 4 Ohio Supp. 252; *Cole v. Groves*, 134 Mass. 471. Some courts have

permitted principals to recover gambling losses suffered by embezzling agents, not by virtue of the gambling statutes, but in equitable actions for money had and received. See *Conway v. Conway,* 4 N. Y. Misc. 312, 24 N. Y. Supp. 261; *Brownlow v. Davis,* 69 Ga. App. 111, 25 S. E. (2d) 150; and *Simpson v. Brooks,* 208 Ark. 1093, 189 S. W. (2d) 364, which cites cases from Georgia, Vermont, Illinois, Colorado, Oklahoma and Indiana in support of the general proposition

". . . that a third person whose money has been lost to another at gambling may recover the same in an action at law against the person or persons winning and receiving the same."

Oregon has a statute almost identical with our own. Section 8264, Oregon Laws, provides:

"All persons losing money or anything of value at or on any of said games, shall have a cause of action to recover from the dealer or player winning the same, or proprietor for whose benefit such game was played or dealt, or such money or thing of value won, twice the amount of the money or double the value of the thing so lost."

*Mozorosky v. Hurlburt,* 106 Ore. 274, 198 Pac. 556, 211 Pac. 893, 15 A. L. R. 1076, arose on an application for a writ of *habeas corpus* by the proprietor of a gambling game who had been imprisoned for debt, after a judgment had been obtained against him by the loser in the game. No question of assignability arose in this case. The court held:

"The statute, in so far as it permits the gambler to recover what he has lost, is purely remedial. But when it makes the gambler who won repay to the losing gambler in twofold for every dollar lost, such a statute, as stated by Mr. Chief Justice Bean, is penal in character: . . ."

It will thus be seen that the right of the loser to recover money or property lost in gambling under statutes similar to ours, is based on the theory that such money or property is, in effect, unlawfully detained by the winner. It rightfully belongs to the loser. Such actions, when brought by the loser to recover from the winner his actual losses, are remedial and not penal. Hence, they are assignable. While most states permit a recovery against the

winner alone, the statutes of Oregon and Washington have given the loser a remedy against "the dealer or players winning the same, or proprietor for whose benefit such game was played or dealt." Appellant contends that, since the action here is brought against such a proprietor, the nature of the recovery is changed so that it is no longer remedial, but is instead, an action for the imposition of a penalty.

This contention is refuted by *Noble v. Martin,* 191 Wash. 39, 70 P. (2d) 1064, which presents a situation closely analogous to the case at bar. That was an action brought by the assignee of some eighty depositors of the defunct American Bank of Spokane against the directors thereof. The action was brought under the authority of Art. XII, § 12, of the Washington state constitution, which makes each director or officer of a bank individually responsible, who shall receive or assent to the reception of deposits after he shall have full knowledge of the fact that such institution is insolvent or in failing circumstances. The question before the court was whether the action was "upon a liability created by statute" or "upon a statute for penalty or forfeiture." After an exhaustive resumé of the authorities, we held that the liability was not penal but remedial, and therefore the various causes of action of depositors were assignable. We quoted from *Frame v. Ashley,* 59 Kan. 477, 53 Pac. 474:

"The general rule is that a statutory obligation to pay damages which the common law does not give is 'a liability created by statute,' where the damages awarded are limited to compensation—limited to an amount which merely makes the injured person whole. The general rule also is that a statutory obligation to pay an amount beyond compensation, to submit to more than the simple redress of the wrong done, to pay not merely in respect of the deserts of the injured person but as punishment for the wrong done, is a penalty. Tested by these simple rules the case is easy of solution. The statutory obligation in question is a liability created by statute, because it is wholly limited to compensation. There is nothing of a penal character in the terms of the law which imposes the obligation. On the contrary,

the statute and other enactments in *pari materia* clearly show that it was intended to be compensatory and not penal."

The constitutional provision considered in the *Noble* case is quite similar in many respects to the statute under consideration here. Art. XII, § 12, is directed against any president, director, manager, cashier, or other officer of a bank. The money deposited does not go to them. But the law has provided a remedy for the depositor against them to the extent of his deposit which has been lost. The statute in the present case provides a remedy for the loser in a gambling game against the proprietor, even though he may not receive the money lost. The purpose in both instances is to compensate the injured party for his losses.

We are of the opinion that § 5851 is a remedial and not a penal statute and that the trustee in bankruptcy succeeded to the causes of action to which the bankrupt was entitled.

Error is claimed in the giving of instruction No. 6:

"The statute which I have quoted to you employs the phrase 'for whose benefit such game was played or dealt.'

"You are instructed that the word 'benefit,' as here employed, has a meaning to which the attention of the jury is hereby directed. The legal definition which is here employed is: A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word 'benefit' therefore, denotes any form of advantage.

"The same statute employs the word 'proprietor,' and the attention of the jury is directed to the following legal definition of the word 'proprietor.' As it is used in the statute, 'proprietor' means the owner, the one who has the legal right or exclusive title to anything, including a business or, in this instance, a gambling game, if any. A natural person or a corporation may be a proprietor."

■ The instruction given was too broad. It was not a very happy definition of "benefit" as applied to the issues of this case. However, we cannot say that the definition given misstates the law. Since appellant failed to propose an instruction containing what it considered a proper definition, it cannot now complain. See *White v. Burke,* 31 Wn. (2d) 573, 197 P. (2d) 1008, and cases cited therein.

■ It is contended that the giving of instruction No. 7 was error:

"You are instructed that the defendants are not entitled to set off or reduce the claims of plaintiff by establishing that MacGillivray may have won money at other separate and distinct 4-5-6 games which he may have played on the premises of the Benevolent & Protective Order of Keglers. For the purpose of determining any amount which the plaintiff may be entitled to recover, winnings by MacGillivray in other separate and distinct games are immaterial."

The instruction was entirely correct. This was not one action for MacGillivray's losses from February 20, 1945, to and including November 22, 1946. There were thirty-nine causes of action, each one separate and distinct from the other. As to each separate cause, the Keglers were entitled to an offset for any money won in that particular game. For example, in Cause No. 5, MacGillivray paid out $1,200, but won $450. So his loss was $750 and that is the amount found by the jury. See *Caldwell v. Caldwell,* 65 Ky. 446.

■ Error is assigned on the refusal to give appellant's proposed instructions Nos. 6, 7, 8, 10, 11, 12, and 14. The record shows that the proposed instructions were handed to the court at noon on March 1, 1949, and that the court gave its instructions that afternoon. The first witness for the defense was sworn on the afternoon of February 24th. The delivery of these proposed instructions was not in accordance with the provisions of Rule 13 of the General Rules of Superior Courts. It is true that the rule provides that, in the event the court disregards such instructions, he shall write on the margin of the proposed instructions that he refuses to consider them because the provisions of the rule have been disregarded. This was obviated by the

statement of the court at the time the exceptions were taken, that the court received the instructions at noon that day. The court clearly and adequately advised counsel as to its reasons for rejecting them. We cannot say that the court abused its discretion in refusing to consider the proposed instructions. *Ogilvie v. Hong,* 175 Wash. 209, 27 P. (2d) 141; *State v. Severns,* 13 Wn. (2d) 542, 125 P. (2d) 659.

During the examination of George Steadman, a prospective juror, by Mr. Malott, one of counsel for respondent, the following occurred:

"I might mention that this action is not being brought for Mr. MacGillivray personally. He is not to share in the benefits from any judgment that might be obtained in this case. It is just for his creditors. Do you understand that?

"A. Yes.

"MR. DE GARMO: That is an improper statement for counsel to make. That is in the nature of testimony, which the jury cannot consider now. That is a matter that will be developed later."

The record is silent as to what then transpired. However, the next morning, before the opening statement, a motion for a mistrial was made and denied. Clearly, the question should not have been asked, but we fail to see how it was so prejudicial to the interests of the appellant as to have warranted the granting of a new trial.

Of much more serious import were the remarks made by the court, in the presence of the jury, in connection with the introduction of certain evidence. The following occurred:

"THE COURT: I don't see why you should allege and attempt to prove in this case, where you have pointed out the line you are to follow, why you should show to the jury other games which probably have a higher percentage of risk.

"What you have to prove is a gambling house, where they gamble for money. That is all you have to do.

"MR. WILLIAMS: But we have to show that there is a benefit to the house.

"THE COURT: There is no question about that, but there are other ways of showing that, some of them you have done. I don't have to mention them to the jury, but they have been suggested to the jury.

"Mr. WILLIAMS: I anticipate that they will show that this was a friendly little game.

"THE COURT: You have a hundred checks to the contrary. It is embarrassing to me because I go by the pleadings when I come over here. A 4-5-6 game. Assume that they play it on the same table where the game is played. I think you should be limited to a 4-5-6 game to show the wicked side of gambling, if that is what you propose.

"Mr. WILLIAMS: Suppose they had no stickman, who, as we assert, was taking a rake-off.

"Mr. DE GARMO: If this is to be argued, it should be argued outside the hearing of the jury.

"Mr. WILLIAMS: Yes, I believe so."

Upon the retirement of the jury, Mr. De Garmo made the following motion:

"Mr. DE GARMO: At this time the defendants wish to move for a mistrial of this case upon the basis of a comment which I think the Court inadvertently made. I am sure it was not intentional, which we regard as prejudicial, a comment on the evidence in the presence of the jury.

"I refer to the comment of the Court that it is necessary for the plaintiff to show benefit, and which they have already done, or words to that effect, which was, in effect, telling the jury that they have sustained the burden which is imposed on them by the statute. We believe that that was inadvertent on the part of the Court, but that it was prejudicial and that it cannot be cured. We move for a mistrial at this time.

"THE COURT: The motion will be overruled. I will allow you an exception."

Upon convening the next morning, the court said:

"THE COURT: Ladies and gentlemen of the jury, during the discussion of counsel last evening, the Court may, at some time, have made some comment of the kind which you felt at that time, or feel now, was intentional, concerning some of the testimony, of a person or persons, or some comment with respect to the merits of the case.

"If you thought at that time, or if you think now that the Court made any such comment, I suggest that you entirely disregard it, because it is not the duty or privilege of the Court—The Court's opinion with respect to evidence is something with which you are not concerned. You are the sole judges of the evidence in the case.

"Proceed, gentlemen."

Art. IV, § 16, of the Washington constitution, provides:

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."

■■ The object of this constitutional provision is to prevent the jury from being influenced by knowledge conveyed to it by the court as to the court's opinion of the evidence submitted. The jury is the sole judge of the credibility and weight of the evidence, and courts should be extremely careful of any comments made in the presence of the jury, because such comments may have great influence upon the final determination of the issues. *State v. Crotts,* 22 Wash. 245, 60 Pac. 403.

In the following cases this court has held that the above-quoted constitutional provision had been violated:

*State v. Hyde,* 20 Wash. 234, 55 Pac. 49, where the jury, after retiring, returned to the court room and stated that they disagreed as to what a certain witness had testified. The court told them what the testimony was from his notes.

*State v. Crotts, supra,* where the court took over the cross-examination of the defendant and conveyed to the jury, from his questions, his opinion as to the defendant's veracity.

*State v. Thield,* 36 Wash. 365, 78 Pac. 919, where the jury was brought back after failing to reach a verdict after eighteen hours. The court told them that it seemed to him it was a very plain case which should be decided without any trouble. He said: "I can't for the life of me see any reason why twelve men should hesitate at arriving at a verdict in this case."

*Patten v. Auburn,* 41 Wash. 644, 84 Pac. 594, where appellant's attorney, in arguing to the jury, asserted that respondent had presented her claim to the town for injuries alleged to have been sustained. Upon objection, the court *stated to the jury* that there was no such evidence, when in fact there *was* evidence on that point.

*Schneider v. Great Northern R. Co.,* 47 Wash. 45, 91 Pac. 565, where, upon an objection to a question concerning plaintiff's condition as to intoxication when he was put off the train, the court said: "I don't think it is very material,

or entitled to much weight, but the jury may consider it."

*State v. Primmer,* 69 Wash. 400, 125 Pac. 158, where, in an incest trial, after the complaining witness had testified, the court said: "The deputy sheriff will take this girl, and I ask that the prosecuting attorney file a charge of perjury against her on her own admissions."

*State v. Jackson,* 83 Wash. 514, 145 Pac. 470, where the court took over the cross-examination of a witness, and, from his questions, clearly indicated that he doubted the veracity of the witness.

*State v. Herwitz,* 109 Wash. 153, 186 Pac. 290, where the court interrupted proceedings and said to the witness: "Your record is just as good as anybody's when you are under oath here, as far as this court is concerned, and this jury, too. You are a perfectly credible witness before this court, and you have not been impeached."

*State v. Vaughn,* 167 Wash. 420, 9 P. (2d) 355, where a deputy prosecutor had been called as a witness by the defense. After being examined the question arose as to whether the witness should ask himself questions on cross-examination. The court said: "I dare say he wouldn't answer anything that he shouldn't."

The following cases have held that the constitutional provision had not been violated:

*State v. Surry,* 23 Wash. 655, 63 Pac. 557, where the appellant was testifying as to the size, style and penetrating power of the pistol fired by him. The court said:

"I don't think the testimony is material or admissible to prove the facts. If that bullet struck the sidewalk, its motion was impeded. It is common knowledge, if that bullet struck the sidewalk its motion was very much impeded, and on the same angle that it went—the angle that it described after it left the sidewalk would be precisely the same as the angle it made from the mouth of the pistol."

This court said:

"In both of these cases it will be observed the objectionable remarks were addressed to the jury, and hence were literally violative of the mandate of the constitution. Here the case is different, the observations objected to having been directed to the counsel. We do not, however, wish to

be understood as holding that a judge, under this provision, is at liberty, during the progress of a trial, to comment in the presence of the jury on the facts which the jury must determine, in a way calculated to influence their action; yet it is manifest, from the language of the constitution, that its primary and special object was to prevent comments on the facts in evidence in connection with the instructions by which the jury are to be guided, and at a time when such comments would be likely to affect their minds. Prior to the adoption of the constitution, it was said to be the custom of some of our judges, either inadvertently or purposely, to indicate their opinions as to the facts in cases before them in their instructions to the jury; and it seems to have been the object of the framers of the constitution, in formulating the provision in question, to correct this supposed evil. But we do not think it was intended by this provision to prevent the judges from giving counsel the reasons for their rulings upon questions presented during the progress of a trial, or to prohibit them, in all cases, from stating, when necessary, the facts upon which they base their conclusions.

" . . . While we are not disposed to overrule the prior decisions of this court as to the object and scope of this constitutional provision, we are not prepared to extend the rule enunciated in those cases so far as to hold that every casual, inadvertent or unnecessary remark made by the judge in reply to a proposition or suggestion of counsel constitutes a sufficient ground for reversing the judgment. In our opinion, it is only such remarks of the presiding judge during the course of a trial as might reasonably influence the mind of an ordinary juror that can justly be said to be inimical to the constitution. And whether error has been committed in a given case must, therefore, depend upon the particular facts and circumstances therein disclosed."

*State v. Hughlett,* 124 Wash. 366, 214 Pac. 841, a bootlegging case, where a dispute arose as to the qualifications of a deputy sheriff to testify as to the contents of a bottle. The court said: "If the witness can say it is whiskey because he has seen it, handled it, looked at it, that is sufficient. If you want to dispute that you can put a chemist on and show that." And again—"If they (the jury) believe the testimony of this witness, they could find there was whiskey in that bottle." We held that this was not a comment on the evidence, that the court was addressing counsel and doing nothing more than giving his reasons for his ruling.

*State v. Polos,* 140 Wash. 399, 249 Pac. 488, a bootlegging case, where a deputy sheriff was asked to identify the man arrested. Objection was made that the witness had not answered counsel's question. The court said: "I think he has. He has stated to the best of his knowledge, and that is all any man can do."

*State v. Johnson,* 141 Wash. 324, 251 Pac. 589, where counsel for defendant contended that, in cross-examining a witness he should be allowed the fullest latitude. The court said: "I think you should; but you should not be allowed, at the same time, to distort the statement of the witness." We held that this was a statement made to the attorney in a ruling upon an objection, and was not a statement made to the jury.

*Lenape Hydraulic Pressing & Forging Co. v. Ellis Resilient Wheel Corp.,* 141 Wash. 571, 251 Pac. 885, where the court said, in ruling on an offer to introduce a carbon copy of a letter: "I think I would make an error. I will have to reverse myself. This witness has testified positively on that matter. That letter would only be corroborative anyway. The letter being from this witness would really not be any more than corroborative. I belive that I would make a mistake if I let that in. You have his evidence on that anyway. I have to sustain that objection."

And again:

"Objection overruled. I understand that those specifications are in Pennsylvania in the office of the plaintiff."

And in the colloquy which followed, the court said:

"No. They are in your possession. . . . You have the specifications and it is the misfortune of counsel that you haven't got them here. . . . It is not proper for the court to tell what the evidence is, but you had notice when you took the depositions that they claimed certain defects in these bolts, and that they were not according to specifications. Now the specifications were in your possession. . . ."

We held that the remarks were addressed to counsel as explaining to them the reasons for the court's ruling and in no sense addressed to the jury. We stated that we were

satisfied that no intelligent juror would or could have been misled thereby, calling attention to the fact that in many recent cases we had refused to reverse on such a showing.

*State v. Shimoaka,* 141 Wash. 337, 251 Pac. 290, where the following occurred:

"MR. MEACHAM: I have phoned for Mr. Jacobson, the City Chemist. MR. GRIFFIN: What is the purpose, may be I will admit it. MR. MEACHAM: Mr. Jacobson will testify he tested these packages and they contain cocaine. THE COURT: You have proven that by the last witness, they have admitted it in open court, I think that is about enough."

We said:

"The statement, while made in the presence of the jury, was not directed to the jury. The colloquy leading up to it, and following it, was wholly between the court and counsel. No one, it would seem, listening to it, would understand, when the colloquy ended, that the fact stated was to be taken as admitted or proven."

*Cummings v. Weir,* 37 Wash. 42, 79 Pac. 487, where the complaint alleged an agreement to pay a reasonable value for their services, and that $65 for each claim located was such reasonable value. During the examination of a witness, the court said: "I think the evidence clearly shows they agreed upon $65. The complaint is on *quantum meruit.* The evidence shows express contract. What is the result of that?"

We held:

"The remark, while made to counsel, was in the presence of the jury, and was indeed a comment upon a material and disputed fact. But it also partook somewhat of the nature of an interrogation to counsel concerning the relation of the pleadings to the evidence submitted, and we think the error was cured by the court's instructions afterwards given, within the rule followed in *Van Lehn v. Morse,* 16 Wash. 219, 47 Pac. 435."

*State v. Elder,* 130 Wash. 612, 228 Pac. 1016, where we said:

"The statements thought to be comments were statements made when ruling on the admissibility of testimony, and were addressed to counsel and not to the jury.

As we have often held, it was not the purpose of the constitutional inhibition to prevent judges from giving counsel the reasons for their rulings upon questions presented during the course of the trial, or prohibit them when necessary from stating the facts upon which they base their rulings. [Citing cases.]"

*State v. Brown,* 19 Wn. (2d) 195, 142 P. (2d) 257, where, during the course of the trial, the state offered a photograph of the scene in which the complaining witness had placed a handkerchief on a bush to indicate where the appellant caught her. Objection was made to the offer, and the court indicated that he was going to admit the exhibit, stating to counsel, "You can ask her where, if you wish," to which counsel replied: "What kind of questions can I ask that will obliterate such a glaring white mark on this?" The court asked, "Are you disputing the assault?"

The following then occurred:

"MR. MILLER: I don't believe I am called on to answer that question at this time. THE COURT: This evidence here, are you denying it? I mean with the admissions, confessions and all that? MR. MILLER: I don't believe . . . THE COURT: Your theory is that the intent is missing to commit the felony? MR. MILLER: I don't believe I should be called on at this time to make any statement. THE COURT: I think that is your theory all the way through in your examination and all that. That seems to be your theory, that he lacked intent to commit the felony, to wit: taking indecent liberties. . . .

"Now, the rest of it—well, the court under the circumstances of the case, the court isn't going to be so meticulous about the matter as it would be if conditions were different, if the issues were different, if the charge were different, if there were no admissions. MR MILLER: At this time . . . THE COURT: (interposing) Did you expect to accompany the officer out there, with the little girl? She went there with the officer, and she was the one who knew where it took place. . . .

"Now do you want her to mark it on this photograph? MR. MILLER: Now [no] I don't want her to mark it on that photograph because I say, that photograph is inadmissible. THE COURT: I disagree with you. I will overrule the objection."

We held:

"The constitutional provision that the trial judge shall not comment upon the evidence means no more than that the trial judge is prohibited from action or words having the effect of conveying to the jury the trial judge's personal opinion as to the truth or falsity of any evidence. This court has said:

" 'But we do not think it was intended by this provision to prevent the judges from giving counsel the reasons for their rulings upon questions presented during the progress of the trial, or to prohibit them in all cases from stating, when necessary, the facts upon which they base their conclusion.' *State v. Surry,* 23 Wash. 655, 63 Pac. 557.

"See, also, *State v. Hughlett,* 124 Wash. 366, 214 Pac. 841; *State v. Elder,* 130 Wash. 612, 288 Pac. 1016.

"In the case at bar, the statements complained of were made while ruling upon an objection to the admissibility of evidence. They did not indicate the judge's opinion as to the truth or falsity of any evidence in the case."

*State v. Coe,* 34 Wn. (2d) 336, 208 P. (2d) 863, where the following occurred:

"MR. SLY: [One of counsel for respondent] I make a motion that the State be permitted to show that that plea in the records of this court is a nullity and that it will be stricken because it is not in conformity with the law of this State and cannot stand. THE COURT: Objection? MR. CARSON: I object to that motion. THE COURT: The court will sustain the Counsel, because that is true. The plea is a nullity. . . . The Court knows what was done in front of the court. We know that. I can't speak for Mr. Sly. MR. SLY: If it please the Court, there was nothing done that was not done in the presence of the court. THE COURT: What we have done in the presence of the court is this; the court was asked if he would accept a plea of guilty to Second Degree Murder and the court said yes, he would. Isn't that correct? MR. SLY: That is correct. THE COURT: If the plea is a nullity, a void plea, the Court has no right to accept it and I state further that this man's counsel has been so told. I don't know whether this lad has been told or not but his counsel has been so told."

We held:

"Remarks or comment made by a judge when deciding upon the admissibility of evidence not addressed to the jury but to counsel are not regarded as a comment on the

facts of the case on trial. *State v. Surry,* 23 Wash. 655, 63 Pac. 557; *State v. Brown,* 19 Wn. (2d) 195, 142 P. (2d) 257; *State v. Gross,* 31 Wn. (2d) 202, 196 P. (2d) 297, and cases cited."

[10] We have reviewed all of these cases because the problem confronting us is an extremely vexing one, especially in view of the apparent hopeless conflict of the authorities. The trend in this state appears to be that remarks addressed entirely to attorneys, in ruling upon questions presented during the progress of the trial, are not comments on the evidence prohibited by the constitution. We do not wish to recede from our earlier decisions holding that it is reversible error for the court to make any comment during the course of the trial which will influence the jurors. But each case must be determined on its own peculiar facts and circumstances.

We do not approve the statements made by the trial court in this case. Lifted out of the record, they appear to be a violation of the constitutional prohibition. But placed in their proper perspective as a very small portion of the record of a trial which lasted more than three weeks, coupled with the myriad of checks and deposit slips which had been introduced as exhibits, and realizing that the remarks were addressed to counsel in ruling on the admission of evidence, and not to the jury, we cannot say that such comments were prejudicial.

Error is claimed in the giving of instruction No. 8:

"The defendant has interposed herein as a defense against the present several causes of action, the Statute of Limitations of the State of Washington.

"You are instructed that the defense of the Statute of Limitations herein interposed has no application to the several causes of action set forth in the plaintiff's complaint, and this defense may be disregarded."

Appellant duly excepted to this instruction on the ground that it was not a correct statement of the law as applicable to this case. Counsel stated:

"The defendants contend with respect to this instruction that either the decision of the Court that this is not

a penal statute and therefore is assignable is in error, or that the two year statute of limitations applies and at least as to the first twelve causes of action the statute of limitations must apply. It cannot be wrong in both instances."

■ The court was squarely presented with the issue of ascertaining whether Rem. Rev. Stat., § 5851, is a penal or a remedial statute, and such determination would require a decision as to which statute of limitations would apply. We have already held that § 5851 is remedial and not penal. This is an action upon a liability created by statute and falls within Rem. Rev. Stat., § 165 [P.P.C. § 73-23], which reads as follows:

"An action for relief not hereinbefore provided for shall be commenced within two years after the cause of action shall have accrued."

The decision in *Noble v. Martin, supra* (191 Wash. 39, 70 P. (2d) 1064) is conclusive on this issue.

■ Apparently the trial court was of the opinion that the three-year statute of limitations applied and gave instruction No. 8 for that reason. In so doing, the court misstated the law. There is a distinction between misdirection and nondirection in the giving of instructions. The former may be taken advantage of by a proper exception to the instruction, but to take advantage of the latter, the trial court's attention must be called to the particular matter and a request made for an instruction on it. We said, in *State v. Walker*, 104 Wash. 472, 177 Pac. 315:

"Where the court assumes to instruct and instructs wrongfully, an exception will save the right of the party litigant to have the matter reviewed in this court. There is, and must be of necessity, a wide distinction between misdirection and nondirection of a jury. In the one case, the trial judge, whose duty it is to declare the law, has actively assumed to perform that duty. If, in the exercise of it, he trenches upon the legal right of a party, an appellate court will correct the wrong. But where the trial judge overlooks the law, a party should not be allowed to take advantage of the error, for, as we said in the case of *State v. Ross, supra,* [85 Wash. 218, 147 Pac. 1149] counsel owes some duty to the court to suggest the error so that it can be cured before the jury receives the case."

708

In order to determine which of the causes of action are barred, reference must be had to 11 U. S. C. A. (Sup.), § 29, subd. e.:

"A receiver or trustee may, within two years subsequent to the date of adjudication or within such further period of time as the Federal or State law may permit, institute proceedings in behalf of the estate upon any claim against which the period of limitation fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy."

 Among other things, it was stipulated in this case that the petition in bankruptcy was filed June 2, 1947. Since the two-year statute of limitation governs, the trustee, therefore, could maintain any action the cause of which arose within two years prior to June 2, 1947. He could not, however, maintain any action, the cause of which arose more than two years prior to that date. From the pleadings and the proof, it is clear that the first eleven causes of action arose more than two years prior to June 2, 1947, and should have been withdrawn from the consideration of the jury. As to them, it was prejudicial error for the court to give instruction No. 8. The giving of such instruction was misdirection, a misstatement of the law, and appellant preserved its rights by excepting thereto. We find no merit in respondent's contention that appellant waived its affirmative defense of the bar of the statute of limitations in the course of the trial.

As to causes of action 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11, the judgment is reversed and remanded with directions to dismiss and eliminate them from the judgment. In all other respects, the judgment is affirmed.

ROBINSON, MALLERY, GRADY, HAMLEY, and DONWORTH, JJ., concur.

HILL, J., concurs in the result.

SIMPSON, C. J., and BEALS, J., dissent.